UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

SUMMER YORK, individually, and )
on behalf of other members of  )
the general public similarly   )
situated,                      )
                               )
                               )
          Plaintiff,           )
                               )  No. 08-CV-07919
      vs.                      )     GAF (FFMx)
                               )
                               )
STARBUCKS CORPORATION, a       )
Washington corporation, and    )
STARBUCKS COFFEE COMPANY, a    )
Washington corporation,        )
                               )
          Defendants.          )
                               )
                               )

DEPOSITION OF SUMMER YORK

FRIDAY, JUNE 12, 2009

LOS ANGELES, CALIFORNIA

Reported By:
SUSAN JAYE
CSR 9605
JOB NO: 72149

CERTIFIED
COPY

Page 1

EXHIBIT B - Page 115

```
1        A     Yes.

2        Q     Who was that?

3        A     Shannon Sawyers.

4        Q     When did you begin working at Starbucks?

5        A     I was officially hired on January 15th, 2003.

6        Q     You started working in what store?

7        A     The Long Beach and Willow location.

8        Q     I'm sorry.  Long Beach and?

9        A     Willow.

10       Q     Is it also called Atlantic?

11       A     No.

12       Q     How long did you work in the Willow store?

13       A     I trained there only maybe a couple months at

14   the most.

15       Q     Then were you transferred to the Atlantic and

16   San Antonio store?

17       A     Correct.

18       Q     You worked at that store until October 11th,

19   2004?

20       A     I believe so.

21       Q     Then you transferred to the store at Lakewood

22   Drive?

23       A     Correct.

24       Q     You worked at that store until January 22nd,

25   2006?
```

                                                    Page 44

1        A     I believe so.

2        Q     That's when you were promoted to shift

3   supervisor?

4        A     Correct.

5        Q     At that point you went to work at the 7th and

6   Redondo store?

7        A     Correct.

8        Q     Was there about a one-week period when you

9   worked at the Pine store?

10       A     Approximately one week.

11       Q     What was the reason for that?

12       A     It was my belief that it was to give the

13  current manager of that store an idea of what kind of

14  worker I was.

15       Q     Who was the current manager of that store?

16       A     Carolyn Dach.

17       Q     Ms. Dach was becoming the manager of the 7th

18  and Redondo store?

19       A     Correct.

20       Q     Who made the decision to promote you to shift

21  supervisor, if you know?

22       A     Carolyn Dach.

23       Q     During the period of time you were working at

24  the Lakewood Drive store you were a barista?

25       A     Correct.

                                              Page 45

```
 1        A     Correct.

 2        Q     And as a shift supervisor?

 3        A     Correct.

 4        Q     Do you recall what your starting hourly wage

 5   was?

 6        A     Approximately seven dollars an hour.

 7        Q     That increased over time?

 8        A     Correct.

 9        Q     What was your hourly wage when you stopped

10   working for Starbucks?

11        A     Approximately $11.50.

12        Q     When did you stop working for Starbucks?

13        A     As I understand it, August 20th, 2008.

14        Q     Was that your decision or the company's

15   decision?

16        A     That was the company's decision.

17        Q     Do you have any bad feelings towards

18   Starbucks?

19        A     No.

20        Q     You like Starbucks?

21        A     I like the coffee there.

22        Q     Do you like the company?

23        A     Can you elaborate?

24        Q     Do you think based upon your experience

25   Starbucks treats its employees fairly?
```

Page 47

```
 1          Q    But not as often as open end?

 2          A    No.

 3          Q    How many work hours did you typically work in

 4    a day?

 5          A    That really could vary from anywhere, I would

 6    say, by work shifts that were two hours to shifts that

 7    were over eight.

 8          Q    How frequently did you work shifts that were

 9    over eight hours?

10          A    I can't estimate that unless I have my

11    schedules in front of me to look at them to refer to.

12          Q    Am I correct that your shifts typically were

13    in the range of five work hours to about seven work

14    hours?

15          A    Typically.

16          Q    Sometimes they were five to six hours?

17          A    Correct.

18          Q    Sometimes your shifts were six to seven work

19    hours?

20          A    Correct.

21          Q    Sometimes your shifts were more than seven

22    hours?

23          A    Correct.

24          Q    Am I correct that your shifts were rarely more

25    than seven and a half work hours?
```

Page 73

1          MR. THERIAULT:  Objection.  Vague and

2    ambiguous.

3          THE WITNESS:  I can't answer that without

4    looking at my -- I mean, I would say in frequently but

5    not rarely.

6    BY MR. KNOPP:

7       Q    You understood during your employment at

8    Starbucks that you were responsible for recording all the

9    hours you worked?

10          MR. THERIAULT:  Objection.  Vague and

11    ambiguous.

12          THE WITNESS:  Can you clarify what you mean

13    by "record"?

14    BY MR. KNOPP:

15       Q    Yes.  When you worked in Starbucks stores

16    there was a mechanism for keeping track of your work

17    time, correct?

18       A    Can you explain what mechanism?

19       Q    Can you explain what mechanism?

20       A    As far as my weekly schedule is concerned?

21    Yes, I had a weekly schedule.  We had a system of

22    punching in and punching out.

23       Q    Correct.  Explain the system of punching in

24    and punching out.

25       A    Well, typically you would come into a shift

                                        Page 74

1    and I would punch my numbers in.  That would be time in.

2    When I had to take a break, I would punch out.

3              The meal break is supposed to be 30 minutes

4    long.  If it is interrupted, I cannot clock in until that

5    30 minutes is up.  At the end of my shift I would clock

6    out.

7         Q    You would clock in and out on the

8    point-of-sale system?

9         A    Correct.

10        Q    That's the cash register, right?

11        A    Correct.

12        Q    So you understood you were responsible for

13   recording all your hours using the point-of-sale system?

14        A    Within the company?  In my understanding that

15   was the company's record of my time.

16        Q    Right.  I'm not asking if you maintained any

17   of the records at home or anything like that.  I'm just

18   trying to establish that you understood part of your job

19   responsibility as a Starbucks partner was to record your

20   work time using the POS system.

21        A    My apology.  That wasn't clear.  Yes.  The

22   answer is yes.

23        Q    You understood the reason you needed to record

24   all your work time was so that you could get paid for all

25   your work time, right?

                                              Page 75

BenchmarkDepo- The Deposition Services Company 310.556.0595

EXHIBIT B - Page 121

```
1          A     Yes.

2          Q     Did you always record your work time

3     accurately?

4                MR. THERIAULT:  Objection.  Vague and

5     ambiguous.

6                THE WITNESS:  To the best of my ability.

7     BY MR. KNOPP:

8          Q     You understood if you forgot to clock

9     in when you started working, there was a way to ensure

10    that you got paid for the time you spent working?

11         A     Correct.

12         Q     You understood there is a way to fix

13    inaccurate punches?

14         A     Correct.

15         Q     Can you describe that?

16         A     Can you clarify exactly what you are referring

17    to?

18         Q     Let me give you an example.  If you were

19    working a shift and you took a meal break and you came

20    back from the meal break and you just forgot to clock

21    back in and you just went about working, you realize

22    this later in the day, there is a way to make sure that

23    you corrected the punches so that it accurately captured

24    the time spent working, right?

25         A     Correct.
```

Page 76

```
 1        A     That's something you would have to ask my
 2   counsel.
 3        Q     I'm asking you if you are aware of Starbucks
 4   ever failing to pay minimum wage to another employee.
 5        A     I know of Starbucks failing to pay for work
 6   performed.
 7        Q     That's what you have already testified about?
 8        A     Correct.
 9        Q     When you were a barista and shift supervisor
10   at Starbucks, you understood the company had a written
11   policy regarding meal breaks, correct?
12        A     Correct.
13              MR. THERIAULT:  Ms. York just explained to you
14   that she would like to take a break.  That was before
15   your last question.  I'm trying to keep from
16   interrupting.
17              So we can take a quick five, ten-minute break?
18              MR. KNOPP:  Sure.
19              MR. THERIAULT:  Thanks.
20              (Recess taken.)
21              MR. KNOPP:  Would you read back the last
22   question and answer?
23              (Record read.)
24   BY MR. KNOPP:
25        Q     You also understood that partners were
```

Page 110

```
 1    required to take scheduled meal breaks?

 2         A     They were required.

 3         Q     You understood the policy was partners were

 4    entitled to a 30-minute meal break on shifts that were

 5    longer than five hours, right?

 6         A     A 30-minute uninterrupted meal break on shifts

 7    that were uninterrupted?  Yes.

 8         Q     That was unpaid?

 9         A     Unpaid.

10         Q     In other words, you were supposed to clock out

11    at the beginning of your meal break, right?

12         A     Right.

13         Q     And then clock back in at the end of it,

14    correct?

15         A     We could not clock back in before that.

16         Q     Did you ever work a shift when it was time for

17    your meal break and there was only one other partner in

18    the store?

19         A     Yes.

20         Q     Did that ever happen in Lakewood?

21         A     I can't specifically recall at Lakewood.

22         Q     But you do recall that happening in Redondo?

23         A     Yes.

24         Q     How frequently did that happen?

25         A     Fairly infrequently.

                                            Page 111
```

EXHIBIT B - Page 124

1      Q    Did you, in fact, take the meal break in those

2  circumstances?

3      A    No.  Because I was instructed that there

4  always had to be two people on the floor.

5      Q    So Starbucks had a policy requiring that

6  there be two people in the store at all times, right?

7      A    If it was not a written policy, it was

8  certainly verbal.

9      Q    Did you understand that if you were required

10  to take a meal break while there were two people in the

11  store, you were supposed to take it in the store?

12      A    Correct.  Although I don't recall reading that

13  anywhere.

14      Q    But you understood it?

15      A    I understood generally that it was frowned

16  upon to leave the store on a meal break.

17      Q    If there were only two partners working?

18      A    In general.

19      Q    Who frowned upon it?

20      A    Management.

21      Q    Did anybody ever tell you at Starbucks you

22  could not leave the premises for a meal break?

23      A    They never said that we could not leave.  The

24  general knowledge was that it was preferred if you stayed

25  in the store because there should be a supervisor or

                                                 Page 112

1      manager on the premise at all times.

2          Q      Did a district manager ever communicate to you

3      that it was preferred that you say in the store during

4      your meal break?

5          A      I cannot recall a district manager.

6          Q      Did a store manager ever communicate that to

7      you?

8          A      I believe so.

9          Q      Who?

10         A      I would have to say I believe Carolyn was the

11     only one.

12         Q      You recall Ms. Dach telling you that you

13     should stay in the store during your breaks?

14         A      I recall Ms. Dach stating that there should

15     always be a supervisor or manager present at the store at

16     all times.

17         Q      Did you sometimes leave the store for meal

18     breaks?

19         A      Occasionally.

20         Q      So you knew you were permitted to do that?

21         A      Well, I knew I was permitted.  Like I said

22     before, it was not -- it was frowned upon.

23         Q      Did anybody ever discipline you for having

24     left the store during a meal break?

25         A      Not that I can recall.

Page 113

BenchmarkDepo- The Deposition Services Company 310.556.0595

1        Q     Where did you go when you left the store for

2    meal breaks?

3        A     If I left it would be go get perhaps food or

4    to go home and come back.

5        Q     It was your decision whether to leave or not?

6        A     Correct.

7        Q     The manager was responsible for scheduling the

8    partner work hours, correct?

9        A     Correct.

10       Q     And managers also scheduled meal breaks?

11       A     I would assume so.  We were supposed to

12   consult -- I can't remember what the name of it is now.

13       Q     Are you familiar with something called the

14   Daily Coverage Report?

15       A     I think that's what I'm thinking of.

16       Q     That's a one-page cheat sheet that lists all

17   the partners working in the store that day?

18       A     Correct.

19       Q     It also indicates scheduled times for breaks?

20       A     Correct.

21       Q     That was something that was available to you,

22   right?

23       A     Correct.

24       Q     And you were responsible for knowing when your

25   breaks were scheduled?

                                           Page 114

1      A    I was responsible for checking that sheet.

2  But I was also responsible for making sure that customers

3  were always being helped at the same time.

4          So if it was very busy and I was scheduled to

5  take a meal break and there is no way that the volume of

6  people in the store would allow for it, I was told that I

7  had to delay my break until that volume -- high volume of

8  customers was taken care of.

9      Q    You sometimes worked shifts that were shorter

10 than five hours, right?

11     A    Yes, sir.

12     Q    You understand that you are not entitled to

13 meal breaks on those shifts?

14     A    Yes, sir.

15     Q    Do you recall ever working a shift longer than

16 10 work hours?

17     A    I recall working one shift that was definitely

18 over eight, but I'm not sure if it was over 10 hours.

19     Q    So you don't have any specific recollection

20 of a day on which you worked 10 or more hours for

21 Starbucks, correct?

22     A    I just answered that question to the best of

23 my ability.

24     Q    Am I correct?

25     A    As I said, there is at least one shift I can

Page 115

1    over four years of employment a minimum of 10 times.

2         Q     Do you have any specific recollection as to

3    why that happened?

4         A     As I said previously in my other answers, the

5    issue with meal breaks and violations had to do with

6    the understaffing of the stores and the volume of the

7    customers.

8         Q     Do you recall ever having a shift longer than

9    six hours where you didn't clock out for a meal break by

10   your choice?

11        A     Can you give me just a second to think,

12   please?  I can think of shifts in which I worked over six

13   hours without a meal break.  What was your wording?

14        Q     Where you didn't clock out for a meal break by

15   your choice.

16        A     Again, that's sort of a "yes" and "no"

17   question.  Because, yes, I can recall doing that.  But,

18   no, because there was an unwritten rule that if you are a

19   supervisor on the shift you are supposed to give your

20   staff or your barista their breaks first and you take

21   yours once theirs have all been completed.

22              If it is too busy to take your meal break,

23   generally speaking, like I said, it was an unwritten rule

24   that you would have to give your break to the barista

25   during their rest periods or their meals first.

                                              Page 117

EXHIBIT B - Page 129

1      Q    The system didn't allow you to clock back in

2   until 30 minutes had passed, right?

3      A    Correct.

4      Q    Did you ever take meal breaks before the time

5   they were scheduled to begin?

6      A    Yes.

7      Q    How frequently did that happen?

8      A    Sometimes.

9      Q    What was the reason that happened?

10      A    Perhaps there was a slow time in the shift in

11   which it was more beneficial for the supervisor to get

12   breaks out of the way.

13      Q    If you were running the shift, you would make

14   that decision?

15      A    Correct.

16      Q    Do you recall ever taking an early meal break

17   when you were a barista?

18      A    If I was instructed to do so.

19      Q    I asked you if you recall that happening.

20      A    Yes.

21      Q    How frequently?

22      A    I would say sometimes over the process of two

23   years of being a barista, it's likely it happened.

24      Q    As a shift supervisor, did you ever decide to

25   take a meal break earlier than scheduled simply because

                                          Page 120

1    that was your preference?

2         A    As a supervisor and an opener, I preferred to

3    take my meal breaks and send other employees on their

4    breaks before the morning rush in order to ensure that

5    everybody was properly given breaks.  That was my

6    decision, yes.

7         Q    When you began a break earlier than it was

8    scheduled to begin, typically how much earlier?

9         A    It depended on how many of the tasks that

10   needed to be done before the daily rush of business was

11   completed.

12        Q    Can you estimate?

13        A    Not precisely, no.

14        Q    Meal breaks were always scheduled to begin

15   before you had worked five hours, correct?

16        A    Well, here's the thing.  When I was working at

17   Lakewood, that store, there was no Starbucks policy for

18   meal break violation compensation.  That is something we

19   never received.  So at that point in time there could

20   have been times where it was scheduled after the

21   five-hour mark because nobody was really held

22   accountable.

23        Q    Do you ever remember one of your meal breaks

24   being scheduled to begin after you had worked five hours?

25        A    I cannot think of a specific example other

                                              Page 121

```
 1    than what I have just stated.
 2          Q     Did you typically begin your meal period at
 3    the scheduled time?
 4          A     I'm sorry.  Didn't you already ask that
 5    question?
 6          Q     I don't think I did.
 7          A     Your question is "typically"?
 8          Q     Did you typically begin the meal break when it
 9    was scheduled on the daily coverage report?
10          A     No.
11          Q     Did you typically begin it before the
12    scheduled time or after?
13          A     Again, that depended on the volume of business
14    and the staffing of the store.
15          Q     There are some days that you began it as
16    scheduled?
17          A     Some days.  There were some days, as I said
18    before, where there wasn't enough staff to have it
19    ensured that it was done.
20          Q     Whether you began the meal break when it was
21    scheduled to begin depended on the staffing that
22    particular day?
23          A     That is what I stated, yes.
24          Q     It also depended upon how busy the store was
25    at that particular time?
```

                                              Page 122

BenchmarkDepo- The Deposition Services Company 310.556.0595

**EXHIBIT B - Page 132**

1         A    Yes.   Excuse me.   I'm going to grab some

2    water.

3              MR. THERIAULT:   Go ahead.

4    BY MR. KNOPP:

5         Q    Do you recall ever beginning a meal period

6    after the scheduled time on a closing shift?

7         A    Let me think.   I think it was very likely.

8         Q    Why do you think that?

9         A    Because during the shifts that I closed, they

10   would have most likely been performed at Lakewood drive

11   thru.   Very frequently we were never given our breaks

12   at the proper time almost the majority of the time.

13        Q    How about in Redondo?

14        A    I rarely closed at Redondo.   Sorry.

15        Q    You don't know whether the partners working

16   closing shifts at Redondo took proper breaks or not?

17        A    I'm not responsible for that knowledge.

18        Q    I'm just asking you if you know.

19        A    If I rarely closed, how would I know?   I'm

20   sorry.   I just not understanding.

21        Q    I'm going to ask it in a "yes" or "no" form.

22             Do you know whether partners working closing

23   shifts in Redondo got proper breaks or not?

24        A    I have no way of knowing that, so no.

25        Q    On the days when you started a meal break

Page 123

1    after the scheduled start time, typically how much later

2    did you start it?

3        A    I'm sorry to sound redundant, but, again, it

4    really depended on the staffing and the volume at the

5    time.  I apologize I can't be more specific, but that's

6    really what it depended on.

7        Q    You don't have to apologize.  I'm just

8    interested in your best recollection.

9             Did it ever occur that you took a meal period

10   after you had worked period of more than five hours?

11       A    You are asking me did it ever occur to me if I

12   took --

13       Q    Let me rephrase it.  Did it ever occur that

14   you worked a period of more than five hours before

15   beginning your meal period?

16            MR. THERIAULT:  Objection.  Vague and

17   ambiguous.

18            THE WITNESS:  Okay.  Can I clarify?  You are

19   asking me if it is clear to me that I worked more than

20   five hours before taking a meal period?

21   BY MR. KNOPP:

22       Q    I'm asking did that ever occur?

23       A    Yes.

24       Q    Okay.

25       A    Wasn't that what we were?

Page 124

EXHIBIT B - Page 134

1        A    It depends.  It could have been a barista in
2    which case -- it is supposed to be -- it is an unwritten
3    policy that it is my responsibility to help them on the
4    floor as supervisor.

5            I also informed Carolyn Dach personally that I
6    do not want to be interrupted on my meal break.

7        Q    On the occasions where you left the store
8    during your meal break, did anybody ever contact you to
9    bring you back to the store before your meal break was
10   scheduled to end?

11       A    I can't think of a specific situation.

12       Q    You understood that you could avoid being
13   interrupted by leaving the store?

14       A    Well, that could have depended if I walked to
15   work.  Let's say I'm working at Starbucks.  I don't have
16   a lot of money.  If my gas task is tank is empty, I don't
17   want to waste that out my break going out to eat.

18       Q    Fair enough.  You understood that if you made
19   the decision to leave the store, you would not be
20   interrupted?

21       A    I understood that that was the general policy.
22   Like you said before, I could have been called.

23       Q    Did that ever happen?

24       A    I can't give you a specific example.  So I
25   can't really say "yes" or "no."

                                        Page 129

BenchmarkDepo- The Deposition Services Company 310.556.0595

EXHIBIT B - Page 135

1        Q    You don't recall that ever happening as you

2   sit here today?

3        A    I cannot give you a specific example.

4        Q    On some occasions when you were interrupted

5   for during a meal period, it was only for a minute or

6   two?

7        A    No.

8        Q    Never?

9        A    Frequently?  I'm sorry.  Did you have

10   something?

11        Q    No.  I want to know on some occasions -- you

12   said seven out of 10 days your meal period was

13   interrupted.

14            On some of those cases was it just for a

15   minute or two?

16        A    It is possible.

17        Q    Sometimes longer?

18        A    Correct.

19        Q    Did you ever clock back in?

20        A    I can't.

21        Q    Did you ever record the time worked in the

22   punch communication log?

23        A    That's a record that I don't have access to.

24        Q    What is your memory?  Do you recall ever doing

25   that?

                                              Page 130

BenchmarkDepo- The Deposition Services Company 310.556.0595

1        A     I cannot recall a specific example.

2        Q     Do you recall anybody ever telling you not to

3    record that time in the punch communication log?

4        A     To the best of my knowledge I can't recall

5    anybody specifically prohibiting me from entering that

6    into the punch communication log.

7        Q     What is your understanding as to why there

8    were some days when your meal breaks were not interrupted

9    and other days when they were?  What would it depend on?

10       A     Well, there were some mornings, and I cannot

11   give you a specific date but I can give you a specific

12   example, in which I was on my meal break and the store

13   had all of a sudden a big rush.  Ms. Dach came back, when

14   she herself could have helped through that rush, and

15   asked me to go up to the floor and help the customers

16   knowing I was on my meal break.

17       Q     In general terms based on your experience, why

18   was it that some days you were interrupted and some days

19   not?

20       A     Going from what I previously stated, the

21   volume and the level of being understaffed.

22       Q     So whether your meal break was interrupted on

23   a particular day depended on the staffing on that

24   particular shift?

25       A     Yes.  Most frequently it was understaffed.

                                        Page 131

1      Q     Whether you are interrupted on a meal break

2   on a particular day depended on how many customers

3   happened to be in the store at the time you were taking

4   your break?

5      A     As well as how competent the other employees

6   were of getting them through a line.

7      Q     If it was maybe a more senior or experienced

8   group of partners, you were less likely to be

9   interrupted?

10      A     I'm wouldn't say that necessarily.

11      Q     You said "competent."  In your experience are

12   the people that are doing the job longer more competent?

13      A     Not necessarily.

14      Q     So based on the skill of the partners who

15   happened to be working at the time that influenced

16   whether you were interrupted or not?

17      A     It was partially due to that.  For the most

18   part, as I said, it had to do with being understaffed and

19   having high volume.

20      Q     Did you ever complain to anybody about not

21   receiving a proper meal break?

22      A     I already stated before that it is written and

23   put in my file, that, yes, I did complain to Carolyn Dach

24   about being interrupted during my meal breaks.

25      Q     On the occasions that you complained about

                                              Page 132

1              MR. THERIAULT:  Objection.  The document

2    speaks for itself.

3              THE WITNESS:  That's what it appears to be.

4    BY MR. KNOPP:

5         Q    Were you in fact paid that one hour of pay

6    subsequent to sending this letter?

7         A    Eventually.  That is something that should

8    have been in the system and should have been paid without

9    me complaining.

10        Q    When you were leading the shift as a shift

11   supervisor, you were responsible for reminding partners

12   when to take theirs breaks?

13        A    I was in charge of the timed deployment, yes.

14        Q    Did you ever instruct a partner to skip a

15   break all together?

16        A    Not to my knowledge.

17        Q    Did you ever instruct a partner to take a meal

18   break late?

19        A    I cannot remember an incident in which I did.

20        Q    Did you ever interrupt a partner's meal break?

21        A    I cannot remember a circumstance in which I

22   did.  Excuse me.

23        Q    Is it fair to say that on the shifts you were

24   running partners always got proper meal brakes?

25        A    I can't say always.

                                          Page 137

1        Q    Do you ever recall it happening a partner

2   didn't get a proper meal break on a shift you were on?

3        A    As I said previously, I cannot recall a

4   specific example.

5        Q    Are you aware of any other partners who chose

6   not to take proper meal breaks?

7        A    Yes.

8        Q    Who did that?

9        A    Other supervisors.

10        Q    This occurred on shifts you were working?

11        A    Not to the best of my knowledge, no.  As I

12   said previously, if it was understaffed and it was a very

13   high volume time, we were all trained verbally that you

14   take care of the customer first and your break comes

15   later.

16        Q    Okay.  I understand your own personal

17   experience.  I'm asking if it happened -- strike that.

18   Let me start over.

19             Are you aware of managers ever telling

20   partners other than yourself to skip meal breaks

21   altogether?

22        A    I can't say whether it did or didn't happen

23   because I wasn't the manager.

24        Q    Are you aware of managers ever telling

25   partners other than yourself to delay taking a meal

                                              Page 138

BenchmarkDepo- The Deposition Services Company 310.556.0595

**EXHIBIT B - Page 140**

1    break?

2         A     Again, the same answer applies.

3         Q     You don't know?

4         A     I can't be held responsible for a manager's

5    conduct.  I'm not the manager.

6         Q     I'm not asking -- that is not the question I'm

7    asking.  I'm asking what you know.

8              Are you aware of any manager at Starbucks ever

9    instructing partners other than yourself to delay their

10   real breaks?

11        A     Again, that is information that the manager

12   and the other employee would know.

13        Q     So the answer is no, you don't have that

14   information?

15        A     I can't supply you with information that I

16   don't have access to.

17        Q     Are you aware of other partners besides

18   yourself having meal periods interrupted?

19        A     I can recall various other employees

20   complaining that their meal breaks are interrupted.  I

21   can't give you various names or dates.

22        Q     You didn't observe that?

23             MR. THERIAULT:  Objection.  Vague and

24   ambiguous.

25

Page 139

1    BY MR. KNOPP:

2        Q    You didn't observe the break being

3    interrupted?

4        A    Well, I'm guessing if that person is on a

5    break, I'm probably busy working.  So I would have to say

6    no.

7        Q    Okay.  When you were employed by Starbucks,

8    did you understand that the company had a written policy

9    regarding rest breaks?

10       A    Didn't you ask that question before?  I was

11   aware that they had a written policy, yes.

12       Q    You understood that the partners were required

13   to take their scheduled rest breaks?

14       A    I was aware that it was a written policy that

15   partners were required to take their meal breaks, but

16   that was not the actual verbal policy.

17       Q    There was a verbal policy?

18       A    Yes.

19       Q    Whose?

20       A    The managers.

21       Q    Which managers?

22       A    Any and all.  There is an unwritten policy

23   that is generally understood.

24       Q    Let me start by asking about the written

25   policy.  Then I'm going to ask about how things actually

                                          Page 140

1    occurred in the store.  Okay?

2              You understood the written policy required

3    partners to take scheduled rest breaks, correct?

4              MR. THERIAULT:  Objection.  Asked and

5    answered.

6    BY MR. KNOPP:

7         Q    I'm sorry.  Did you answer?

8         A    I said yes.

9         Q    You understood that that policy provided the

10   partners were not to end their breaks early to return to

11   work, correct?

12        A    I'm sorry.  Can you clarify that?

13        Q    Yes.  Partners were supposed to work the

14   entire rest break and not return to work early?  I'm

15   sorry.

16             MR. THERIAULT:  Objection.  Vague and

17   ambiguous.

18             Could you read that back one more time?

19             MR. KNOPP:  No.  I'm going to ask it again.  I

20   misspoke.

21             MR. THERIAULT:  Okay.

22   BY MR. KNOPP:

23        Q    You understood the policy provided for a

24   10-minute rest break for each four-hour period of work?

25        A    I understood that that was the written policy,

                                          Page 141

1    yes.

2         Q    And that the rest period should occur around

3    the midpoint of each four-hour period of work?

4         A    Ideally, yes.

5         Q    Rest breaks were scheduled on the daily

6    coverage report, right?

7         A    As far as I'm aware.

8         Q    That report was available to you, right?

9         A    Correct.

10         Q    And you were responsible for knowing when your

11    rest breaks were scheduled, right?

12         A    As a supervisor, yes.

13         Q    You understood that you were permitted to

14    leave the store during your rest break, right?

15         A    I suppose.

16         Q    Were you a smoker?

17         A    No.

18         Q    You didn't smoke cigarettes while you were

19    employed by Starbucks?

20         A    I'm asthmatic.  No.

21         Q    Did you sometimes leave the store taking a

22    rest break?

23         A    Perhaps.  You are asking me to recall.  I

24    could have gone next store to go get sushi.  It is highly

25    doubtful because 10 minutes isn't a long time.

                                              Page 142

1      Q      You understand that you are permitted to leave

2   the store?

3      A      Yes.

4      Q      When you took a rest period was it typically

5   at least 10 minutes?

6             MR. THERIAULT:  Objection.  Vague and

7   ambiguous.

8             THE WITNESS:  It was supposed to be in the

9   written policy 10 minutes.  No more, no less.

10  BY MR. KNOPP:

11     Q      When you took a rest period, was it in fact

12  typically 10 minutes long?

13     A      Well, it depended if I was interrupted during

14  that time.  It could have been less.

15     Q      You were sometimes interrupted?

16     A      Yes.

17     Q      If you weren't interrupted, did you spend at

18  least 10 minutes on the rest break?

19     A      I would say 10 minutes.

20     Q      What did you do during the rest break

21  typically?

22     A      It depends.  I could have purchased a snack to

23  eat.  I could have made a drink to drink.  It kind of

24  depends on the day.

25     Q      Did you ever choose to end your rest period

Page 143

BenchmarkDepo- The Deposition Services Company 310.556.0595

EXHIBIT B - Page 145

1    before 10 minutes was up?

2              MR. THERIAULT:  Objection.  Vague and

3    ambiguous.

4              THE WITNESS:  As I said before, as a

5    supervisor, it was my responsibility as told to me

6    verbally by management to put the customers first if

7    there is high volume, then yes.

8    BY MR. KNOPP:

9         Q    You made that choice rather than...

10        A    I made the choice to do as I was instructed.

11        Q    How did you decide whether it was high volume

12   or not?

13        A    Well, that depended on the amount of staff and

14   the amount of people in line.

15             If the amount of people in line was too

16   overwhelming for the staff, then that would constitute

17   high volume.

18        Q    You would make the decision at that point to

19   end your break?

20        A    That is how I was trained.

21        Q    Who trained you that way?

22        A    Carolyn.

23        Q    Anybody else?

24        A    Not that I can think of.

25        Q    Did it ever occur that you had a shift where

                                              Page 144

1    you didn't receive a scheduled rest break at all?

2        A    I'm sure there were.

3        Q    How frequently did that happen?

4        A    Again, it really depended upon the volume of

5    the store at the time and the staffing level.

6        Q    How frequently did it happen that you had to

7    skip a rest break entirely?

8            MR. THERIAULT:  Objection.  Vague and

9    ambiguous.

10           THE WITNESS:  Throughout the four years of

11   employment?  I would say frequently.

12   BY MR. KNOPP:

13       Q    If you had to say on a weekly basis, how

14   frequently would it happen that you missed a rest break

15   entirely?

16       A    I honestly can't estimate that.

17       Q    In the typical day you were scheduled to

18   take one rest break before your meal period?

19       A    That was the ideal scenario.

20       Q    Were you scheduled to take another rest break

21   after your meal period?

22       A    That depended on the length of the shift.

23       Q    How long did the shift have to be for you to

24   get a second rest break?

25       A    I believe it was over six or seven hours.

                                        Page 145

1        Q      Sometimes in order to accommodate customers

2    you would have to delay a rest break?

3        A      Correct.

4        Q      On those occasions you understood that you

5    were responsible for taking the rest break at the first

6    opportunity, correct?

7        A      If the opportunity was available.

8        Q      Did you in fact do that?

9        A      When it was applicable.

10       Q      Were there days on which you got all the rest

11   breaks you thought you were entitled to?

12       A      Yes.

13       Q      And some days when you believe you didn't?

14       A      Yes.

15       Q      In your experience what did it depend on?

16       A      I'm sorry for being redundant, but it really

17   did depend upon the volume of customers and the staffing

18   of all the stores.

19       Q      Did it also depend upon the skill of the

20   people working on that particular shift?

21       A      Sometimes.

22       Q      Did it depend upon the time of day you were

23   working?

24       A      It depended more on the volume.

25       Q      When you took a rest break after it was

                                            Page 147

1    scheduled to begin, typically how long after?

2        A    Again, that depended on the volume of the

3    customers, the staffing of the store.  It was whenever I

4    could get the chance.

5        Q    How frequently did it occur that you took a

6    rest break but after it was scheduled to begin?

7        A    Again, it all varies depending on how many

8    customers there are at the time and how many employees

9    there are in the store.

10       Q    Are you able to estimate the frequency with

11   which you took a rest break but it was after it was

12   scheduled to begin?

13       A    Well --

14            MR. THERIAULT:  Objection.  Vague and

15   ambiguous.

16            THE WITNESS:  Generally speaking, throughout

17   the four years of my employment with Starbucks that we

18   are referring to, my experience was that it was very

19   frequently understaffed for the amount of volume that was

20   there.

21            There were many times in which rest breaks

22   were delayed or forgone.

23   BY MR. KNOPP:

24       Q    I think we have covered the forgone scenario.

25   Now I'm focusing on the delayed scenario.

Page 148

```
 1              I'm asking if you are able to estimate the

 2     frequency with which that occurred.

 3              MR. THERIAULT:  Objection.  Vague and

 4     ambiguous.

 5              THE WITNESS:  I would say that breaks were

 6     frequently delayed.  Rest breaks were frequently delayed.

 7     BY MR. KNOPP:

 8        Q    Once a week that happened?

 9        A    Once a week isn't frequently, not in my

10     opinion.

11        Q    Tell me what it is.

12        A    I would say five times a week.

13        Q    Every single day that happened?

14        A    There are seven days in a week.

15        Q    You didn't work seven days in the week

16     typically, did you?

17        A    I'm saying an average week in which I could

18     have worked six.  I could have worked seven.  It all

19     depends.

20        Q    Let's pretend it was a week where you worked

21     five days.

22        A    I'm supposed to pretend?

23        Q    Hypothetically.  In a week in which you worked

24     five days, based on your experience how many times did it

25     occur that your rest breaks started after the time you
```

                                            Page 149

BenchmarkDepo- The Deposition Services Company 310.556.0595

1   were scheduled to begin?

2              MR. THERIAULT:   Objection.   Vague and

3   ambiguous.

4              THE WITNESS:   I would say a minimum of three

5   times.

6   BY MR. KNOPP:

7        Q    You are not able to estimate how much time

8   passed between when it actually began and when it was

9   scheduled to begin on a typical day?

10       A    Not to my knowledge.

11       Q    I believe you testified that sometimes rest

12   breaks were interrupted?

13       A    Correct.

14       Q    Am I correct that that never occurred if you

15   took the rest break outside the store?

16       A    Well, that depends.   If I took my time and sat

17   down on the patio furniture outside, there were times,

18   yes, when other employees came and said, "Oh, can you

19   help us?"

20       Q    Your rest breaks were always on the clock,

21   correct?

22       A    Yes.   10 minutes.

23       Q    How frequently were your rest breaks

24   interrupted?

25       A    I would say sometimes.

Page 150

1        Q     Besides that are you able to estimate with any
2    more specificity than that?
3        A     At this point in time?  No.
4        Q     Sometimes they were interrupted and sometimes
5    they weren't, right?
6        A     Correct.
7        Q     When they were interrupted, can you estimate
8    for how long?
9              MR. THERIAULT:  Objection.  Vague and
10   ambiguous.
11             THE WITNESS:  That really depends upon the
12   scenario.  If I'm interrupted to go help a flow of
13   customers, who knows?
14   BY MR. KNOPP:
15       Q     I don't.
16       A     I don't either.
17       Q     Just to be clear, you can't really estimate
18   how frequently they were interrupted and you can't
19   estimate for how long they were interrupted when that
20   happened; am I right?
21             MR. THERIAULT:  Objection.  Vague and
22   ambiguous.  Compound.
23             THE WITNESS:  I can tell you with specificity
24   that they were interrupted.
25

                                              Page 151

1    BY MR. KNOPP:

2         Q     But beyond that you can't be any more

3    specific?

4         A     I cannot because the situations varied.

5         Q     You understood when a rest break was

6    interrupted, Starbucks policy allowed you to begin a new

7    one when you were finished whatever task you were called

8    back to do?

9               MR. THERIAULT:  Objection.  Vague and

10   ambiguous.  Speculative.

11              THE WITNESS:  That was understood.  We

12   were required to also get our tasks done.  If that meant

13   that our window of opportunity for a 10-minute break had

14   gone by, we were still required to do those tasks.

15   BY MR. KNOPP:

16        Q     Were there occasions when in fact a rest break

17   was interrupted and you began a new one when an

18   opportunity presented itself?

19        A     Yes.

20        Q     You knew you could do that?

21        A     I was aware.  Again, it depended upon the

22   volume and the staffing.

23              MR. KNOPP:  Why don't we take a short break?

24              (Recess taken.) You.

25

Page 152

1          A     I can't give you a specific time or date.

2          Q     Did you ever complain to anybody in writing

3     about not receiving a proper rest break?

4          A     Not to the best of my knowledge.

5          Q     When you were running shifts as a shift

6     supervisor, did you remind partners as to when to take

7     their scheduled rest breaks?

8          A     Yes.

9          Q     Did you ever advise a partner to skip a rest

10    break?

11         A     No.

12         Q     Did you ever advise a partner to cut her rest

13    break short?

14         A     Not that I recall.

15         Q     Did you ever tell a partner to delay taking a

16    rest break?

17         A     I can't think of a specific example.

18         Q     To the best of your knowledge, did the

19    partners working on shifts that you were running take

20    proper rest breaks?

21         A     To the best of my knowledge, yes.

22         Q     Are you aware of any partners, other than

23    yourself on shifts you were not running, who didn't get

24    proper rest breaks?

25         A     Not to my knowledge.

                                        Page 154

1          Q     Did you ever personally interrupt another

2     partner's rest breaks?

3          A     Not that I can recall.

4          Q     Do you recall ever observing somebody else

5     interrupt another partner's rest break?

6          A     I can't recall at this time.

7          Q     Did you ever observe somebody instruct a

8     partner to skip a rest break?

9          A     I can't recall a specific example at this

10    time.

11         Q     Did you ever observe somebody instruct another

12    partner to cut a rest break short?

13         A     I can't think of a specific example at this

14    point in time.

15         Q     Did you ever observe somebody instruct another

16    partner to delay taking a rest break?

17         A     I can't think of a specific time.

18         Q     Did you ever observe another partner choose to

19    forego a rest break because that was their preference?

20              MR. THERIAULT:   Objection.   Vague and

21    ambiguous.

22              THE WITNESS:   Again, I can't recall a specific

23    example.

24    BY MR. KNOPP:

25         Q     What is the last day on which you worked for

                                              Page 155

```
 1                          Certificate

 2

 3              I, the undersigned, a Certified Shorthand

 4    Reporter of the State of California, do hereby certify:

 5              That the foregoing proceedings were taken

 6    before me at the time and place herein set forth; that

 7    any witnesses in the foregoing proceedings, prior to

 8    testifying, were placed under oath; that a verbatim

 9    record of the proceedings was made by me using

10    machine shorthand which was thereafter transcribed

11    under my direction; further, that the foregoing is an

12    accurate transcript thereof.

13              I further certify that I am neither

14    financially interested in the action or a relative

15    or employee of any attorney of any of the parties.

16              IN WITNESS WHEREOF, I have this date

17    subscribed my name.

18

19    Dated: June 22, 2009

20

21

22

23              SUSAN JAYE
                CSR No. 9605

24

25

                                              Page 184
```

1  **INITIATIVE LEGAL GROUP APC**
   MARC PRIMO (SBN 216796)                          **E-FILED 7/24/2009**
2  MATTHEW T. THERIAULT (SBN 244037)
   JENNIFER GROCK (SBN 245671)
3  MTheriault@InitiativeLegal.com
   JGrock@InitiativeLegal.com
4  Initiative Legal Group APC
   1800 Century Park East, 2nd Floor
5  Los Angeles, California 90067
   Telephone:  (310) 556-5637
6  Facsimile:  (310) 861-9051
   Attorneys for Plaintiff Summer York
7
   **AKIN GUMP STRAUSS HAUER & FELD LLP**
8  GREGORY W. KNOPP (SBN 237615)
   MARK R. CURIEL (SBN 222749)
9  CYNTHIA S. CHOU (SBN 246330)
   gknopp@akingump.com
10 mcuriel@akingump.com
   cchou@akingump.com
11 2029 Century Park East, Suite 2400
   Los Angeles, CA 90067
12 Telephone:    310.229.1000
   Facsimile:    310.229.1001
13 Attorneys for Defendant Starbucks Corporation dba Starbucks Coffee Company

14              UNITED STATES DISTRICT COURT

15              CENTRAL DISTRICT OF CALIFORNIA

16                   WESTERN DIVISION

17

18 SUMMER YORK, individually, and          Case No. CV08-07919 GAF (PJWx)
   on behalf of other members of the
19 general public similarly situated,      ~~[PROPOSED]~~ ORDER RE:
                                           CONTINUANCE OF CLASS
20              Plaintiffs,                CERTIFICATION DEADLINES

21         v.                             Ctrm:    740-Roybal
                                          Judge:   Honorable Gary A. Feess
22 STARBUCKS CORPORATION, a
   Washington Corporation, and            Discovery Cutoff:  March 15, 2010
23 STARBUCKS COFFEE COMPANY,              Pre-Trial Conference:  April 19, 2010
   a Washington Corporation,              Trial Date:   May 18, 2010
24
                Defendants.
25

26

27

28
   CASE NO. 08-CV-07919-GAF (PJWx)                Page 1

   [PROPOSED] ORDER RE:  CONTINUANCE OF CLASS CERTIFICATION DEADLINES

Initiative Legal Group APC
1800 CENTURY PARK EAST, SECOND FLOOR, LOS ANGELES, CALIFORNIA 90067

EXHIBIT C - Page 157

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Initiative Legal Group APC
1800 CENTURY PARK EAST, SECOND FLOOR, LOS ANGELES, CALIFORNIA 90067

# [PROPOSED] ORDER

The parties to the above-captioned action entered into a stipulation to continue by 60 days the class certification filing deadline, with commensurate extensions with regard to the deadlines by which Defendant must file its Opposition and Plaintiff must file her Reply, and with regard to the hearing on Plaintiff's Motion for Class Certification.

After considering the Stipulation of the parties, the facts upon which the Stipulation is based, and good cause appearing, it is hereby **ORDERED**:

1. That the currently scheduled date by which Plaintiff must bring her Motion for Class Certification, August 17, 2009, be continued to October 16, 2009.

2. That the currently scheduled date by which Defendant must bring its Opposition to Plaintiff's Motion for Class Certification, September 21, 2009, be continued to November 30, 2009.

3. That the currently scheduled date by which Plaintiff must bring her Reply in support of Plaintiff's Motion for Class Certification, October 5, 2009, be continued to December 14, 2009.

4. That the currently scheduled date for Plaintiff's Motion for Class Certification, October 19, 2009, be continued to December 21, 2009 at 9:30 a.m.

5. Plaintiff shall not propound any further written discovery on class certification issues, and any further depositions she notices on the same shall be noticed such that they be completed prior to August 17, 2009.

6. This agreement shall be without prejudice to any right of Plaintiff to move to compel discovery that has already been propounded and/or noticed prior to the date of the parties' stipulation.

CASE NO. 08-CV-07919-GAF (PJWx)                     Page 2

[PROPOSED] ORDER RE:  CONTINUANCE OF CLASS CERTIFICATION DEADLINES

**EXHIBIT C - Page 158**

1    7.  This agreement shall be without prejudice to any right of Plaintiff to

2        seek any class merits discovery, as appropriate, following a ruling on

3        the certification issue.

4    **IT IS SO ORDERED.**

5

6    Dated: July 24, 2009 _____          _____

7                                                    Hon. GARY FEESS
                                                UNITED STATES DISTRICT
                                                    COURT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER RE:  CONTINUANCE OF CLASS CERTIFICATION DEADLINES

Initiative Legal Group APC
1800 CENTURY PARK EAST, SECOND FLOOR, LOS ANGELES, CALIFORNIA 90067

**EXHIBIT C - Page 159**

# ⊞ INITIATIVE LEGAL GROUP APC

MATTHEW T. THERIAULT
310.556.6824 Direct
MTheriault@InitiativeLegal.com

July 29, 2009

<u>VIA U.S. MAIL AND EMAIL</u>

Mr. Mark R. Curiel
Mr. Gregory W. Knopp
Ms. Cynthia S. Chou
Akin Gump Strauss Hauer & Feld LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3012

Subject:   <u>York v. Starbucks Corporation, et al.</u>
           Case No: 08-CV-07919-GAF (PJWx)

Dear Mr. Curiel:

Thank you for meeting with me on July 17, 2009 to discuss Starbucks's objections to written discovery. This letter is not meant to be an exhaustive meet and confer on all issues related to document production and further depositions. I expect that additional correspondence will be sent as soon as we complete our review of the document production and Ms. Rutt's deposition transcript. This letter specifically addresses our two discussions about the production of time and wage records and sets forth a proposal for Starbucks to produce these records for 10% of the class.

The time and wage records sought in Requests for Production Nos. 80 through 84 are relevant to issues that will be raised in Plaintiff's motion for class certification, relating to the meal period, rest period and late final pay causes of action. As a preliminary matter, I note that our firm has successfully compelled time and wage records in meal period cases (*see, e.g., Hill v. Eddie Bauer*, 242 F.R.D. 556 (C.D. Cal. 2007)) and our firm has successfully certified late final pay claims through the use of statistical analysis of time and wage records. *See, e.g., Moreno v. Autozone, Inc.*, 251 F.R.D. 417 (N.D. Cal. 2008).

Consistent with our typical approach in certifying meal period claims, we intend to retain an expert who will analyze the time records and opine whether there are statistically-recognizable patterns of meal break violations. *See, e.g., Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1180 (9th Cir. 2007) ("It is well-established that commonality may be established by raising an inference of class-wide discrimination through the use of statistical analysis."); *Sav-On Drug Stores*, 34 Cal. 4th 319, 333 (2004) ("California courts and others have in a wide variety of contexts considered pattern and practice evidence, statistical evidence, sampling

evidence, expert testimony, and other indicators of a defendant's centralized practices in order to evaluate whether common behavior towards similarly situated plaintiffs makes class certification appropriate."). Specifically, the analysis will reveal (1) whether the partners were entitled to zero, one or two 30-minute meal periods; (2) whether the partners were taking their meal periods; and (3) whether the meal periods were being taken within the first five hours of the shift in accordance with Starbucks' policy. The analysis is likely to provide support for Plaintiff's claims that potential class-wide meal period violations exist, and more specifically, will be probative of Plaintiff's claim that common questions of fact and law predominate over individual issues and that Plaintiff's claims are typical of the class. While we anticipate several, discrete common questions of fact and law with respect to the meal period claim, the basic question is whether Starbucks' meal period policies and procedures effectively provided meal periods and, to the extent they did not, whether Starbucks' break penalty payment policies and procedures adequately compensated partners who were not provided with meal periods.

In anticipation of your argument concerning the underlying legal standard relating to meal periods on review in *Brinker Restaurant Corp. v. Superior Court*, 85 Cal. Rptr. 3d 688 (2008) ("ensure" vs. "make available"), the time records remain probative of these questions even if Judge Feess adopts the more permissive standard advocated by employers, because the records will still tend to show that partners were working through their meal periods or were receiving them after five hours of work. Of course, if Judge Feess adopts the more restrictive definition of "provide," an analysis of the time and wage records may prove to be the most probative evidence supporting certification of the meal period claims.

Additionally, the expert may also opine on whether there are statistically-recognizable patterns of meal break occurrences by store location or time period, which is a relevant inquiry both in terms of Plaintiff's certification motion and Starbucks' anticipated defense.

The corresponding wage records are equally relevant in that they will be probative of the effectiveness of Starbucks' policy and practice of paying break penalties. Moreover, while the time records may reveal a relatively constant meal period occurrence rate throughout the class period, we strongly suspect that an analysis of the wage records will reveal no consistent policy or practice to pay the break penalty throughout the class period. Notably, Ms. York was not paid any break penalties prior to November 2006, which, not surprisingly, corresponds with Starbucks' institution of the Meal Break Analysis Report that flagged the meal period violations. Of course, even after November 2006, there are many instances of meal period violations with no corresponding break penalty, calling into question the effectiveness of the procedures altogether.

Separately, a comparison of the time and wage records is likely to reveal whether Starbucks has ever paid a break penalty as a result of a missed rest break, even though it appears that Starbucks did not separately designate rest break penalties from meal period penalties. By breaking out the break penalties based on meal period occurrences, any remaining break penalties should be penalties that were paid as a result of rest period violations. However, given that Starbucks' written policies and procedures on the payment of the break penalties singularly focus on meal periods, I strongly suspect that Starbucks has never paid a break

EXHIBIT D - Page 161

penalty because of a rest break violation.  But, in any event, an analysis of the time and wage records should readily answer this question.

Finally, an analysis of the time and wage records of formerly employed partners is likely to lead to the discovery of admissible evidence of class-wide violations of Labor Code sections 201 and 202 related to the final payment of wages.  However, our anticipated statistical analysis of Starbucks' records as it relates to these claims will be the subject of a separate letter, because we first want to explore with you whether there are additional documents that would complement this analysis.

Relating to privacy concerns, the disclosure of time and wage records in this case is no more intrusive than the disclosure of the highly personal records that were compelled in *Alch v. Superior Court*, 165 Cal. App. 4th 1412 (2008), which, notably, were compelled over the objections of the class members.  *Id.*, at 1438.  In any event, the logical compromise on this issue would be for Starbucks to produce them pursuant to the protective order.

Relating to burden, Starbucks could produce all time and wage records for all partners within the class definition, but that is not strictly necessary.  In determining the sample size, my goal is to minimize the burden on Starbucks while providing any expert with sufficient data to form a reliable opinion.  Of course, the production of all records would eliminate any debate about whether the sample size was sufficiently representative.  However, a sampling of all time and wage records for 10% of the class members should be sufficient to overcome any argument that the sample is not representative.  Our expert would randomly determine which individuals should be included in the sample, and we would provide you with identifying information for production.  If we can agree on these issues, then I would also like to discuss with you whether there is a way to produce the records in a manner that would allow our respective experts to analyze and manipulate the data without first having to convert the data to a useable format, thus minimizing the costs to both parties.

I look forward to hearing from you and ask that you respond reasonably soon.

Sincerely,

Matthew T. Theriault

EXHIBIT D - Page 162

**ORIGINAL**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

SUMMER YORK, individually, and )
on behalf of other members of )
the general public similarly )
situated, )
)
          Plaintiffs, )
)
     vs. ) Case No.
) CV08-07919 GAF (PJWx)
STARBUCKS CORPORATION, a )
Washington Corporation, and )
STARBUCKS COFFEE COMPANY, )
a Washington Corporation, )
)
          Defendants. )
_____)

DEPOSITION OF PERSON MOST KNOWLEDGEABLE

FOR STARBUCKS CORPORATION, JANA RUTT

Date and Time: Thursday, July 16, 2009
               9:51 a.m. - 3:38 p.m.

Location:      Premier Business Center
              19200 Von Karman Avenue
              6th Floor
              Irvine, California

Reporter:      Lexann Christy, CSR
              Certificate No. 7932



800-640-1949
www.mwadepos.net · www.desertdepos.com

**EXHIBIT E - Page 163**

Jana Rutt
07/16/09

1    partially responsible, for ensuring that the baristas and

2    the other partners are taking their meal periods and rest

3    breaks when they're supposed to be taking them?

4        A    Yes.

5            MR. THERIAULT:  The next exhibits are 24, 25, 26 and

6    27.

7                (Exhibits 24 through 27 were marked for

8                identification.)

9    BY MR. THERIAULT:

10       Q    All these have the title "Partner Guide," and it

11   appears that -- just to shortcut this, they are the

12   various Partner Guides from 2004, 2005, 2006, 2007, not

13   necessarily in that order, but -- the reason why I came to

14   that conclusion is I see there's a month and year

15   throughout these in what would be the right-hand corner.

16           Now, when Starbucks hires a partner, are the

17   partners provided with a copy of the Partner Guide?

18       A    Yes.

19       Q    And would "Employee Handbook" sort of be a

20   generic term for the Partner Guide?

21       A    Yes.

22       Q    And do all partners within California upon their

23   hire within the period for which the book applies receive

24   this handbook?

25       A    Yes.

Page 65

Jana Rutt
07/16/09

1        Q      And do they receive this handbook at the First

2    Impressions orientation?

3        A      Yes.

4        Q      And this book, at least in general terms,

5    provides information about Starbucks' policies and

6    procedures, specifically as they relate to this case, meal

7    periods, rest periods, overtime, final payment of wages?

8        A      Yes.

9        Q      Does Starbucks update this book on a yearly

10   basis, if you know?

11       A      Starbucks would update this as needed.

12       Q      Now, is this Partner Guide -- Exhibit 24, for

13   instance, is this a Partner Guide that is provided only to

14   partners within California, or is this Starbucks' Partner

15   Guide with respect to the entire country?

16       A      I believe this is the U.S. version, so it would

17   apply to the entire United States.

18       Q      Do California employees receive additional

19   information that is California specific?

20       A      California managers receive a training or part

21   of a training program that is pertinent to California, and

22   it would be their responsibility as a part of First

23   Impressions to provide supplement to this Partner Guide if

24   there were California specific rules and regulations.

25       Q      There are, in fact, supplemental guides related

Page 66

```
 1

 2

 3        I, the undersigned, a Certified Shorthand

 4   Reporter of the State of California, do hereby

 5   certify:

 6            That the foregoing proceedings were taken

 7   before me at the time and place herein set forth; that

 8   any witnesses in the foregoing proceedings, prior to

 9   testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14            I further certify that I am neither

15   financially interested in the action nor a relative or

16   employee of any attorney of any of the parties.

17            IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19
                        JUL 23 2009
20   Dated: _____

21

22

23

24        LEXANN CHRISTY, CSR

25        CERTIFICATE No. 7932
```

Maxene Weinberg Agency
(800) 640-1949

**EXHIBIT E - Page 166**



STARBUCKS COFFEE COMPANY
PARTNER GUIDE

U.S. Store Version

A Guide to Your Partner Experience

Pl.'s Exhibit 024

# Contents

Letter from Jim and Margie

Section 1 – Mission Statement and Guiding Principles.................................4

Section 2 – Starbucks: An Introduction........................................................5

Section 3 – Starbucks: The Story..................................................................6

Section 4 – Your Position...............................................................................9

Section 5 – Your Pay....................................................................................13

Section 6 – Codes of Conduct and General Policies....................................15

Section 7 – Protecting Company Interests...................................................23

Section 8 – How We Communicate...............................................................25

Section 9 – Learning and Development........................................................27

Section 10 – Your Safety and Security.........................................................29

Section 11 – Time Away From Work.............................................................31

Section 12 – Total Pay Overview/Benefit Plans and Programs....................38

Section 13 – Leaving Starbucks...................................................................44

Section 14 – Starbucks Corporate Social Responsibility.............................45

Index...........................................................................................................49

Partner Acknowledgement

---

## AT-WILL EMPLOYMENT

Each partner's employment with Starbucks Coffee Company is "at-will." This means that either Starbucks or the partner may terminate the employment relationship at any time, with or without notice. The only exception to this policy would be a written contract of employment, signed by the partner and Starbucks chief executive officer, president, executive vice president or senior vice president.

---

**CONFIDENTIAL**

**STAR_YORK001326**

Section 4

## Working Additional Hours (Overtime)

Hourly or salaried nonexempt partners will be paid for all hours worked, including overtime. Overtime is considered hours worked in excess of 40 per week, or could include hours worked in excess of eight per day, where defined by state law. Hourly partners are required to obtain advance approval from the store manager before working any daily or weekly overtime hours.

Salaried exempt managers will be expected to work any additional hours in order to meet the job objectives and responsibilities. No extra payment will be made for the additional work.



## Rest and Meal Breaks

Regular breaks during the day provide partners with the energy and outlook our customers enjoy. All nonexempt partners (bus persons, baristas, shift supervisors, assistant store managers and California store managers) are required to take scheduled meal and rest breaks. Under no circumstances may a nonexempt partner perform work during the meal or rest break, or end the break early to resume work. Nonexempt partners are free to leave the store during a meal or rest break.* Breaks may not be skipped in order to report to work late or leave work early.

Rest breaks: All nonexempt partners receive a rest break of not less than 10 minutes for each four-hour period of time worked. The rest break will be scheduled by the manager and should occur as near as possible to the midpoint of each four hours worked. Rest breaks are paid. The partner should not punch out for a rest break.

Meal breaks: Each nonexempt partner receives an uninterrupted 30-minute meal break if the partner is scheduled to work a shift of a minimum duration. Whether the partner will receive a meal break at some time during his or her shift depends on the length of the shift and the state in which the partner is employed. Nonexempt partners are required to clock out at the beginning of the meal break and back in when the meal break is over. Each nonexempt partner is responsible for taking a full 30-minute meal break and should refrain from returning to work until the full meal break is over.

*Special note: Starbucks Safety and Security Guidelines require the presence of at least two partners in the store at all times. If a partner is scheduled for a meal break and only one other partner is on shift, the partner should retire to the back of the store for the duration of his or her meal break. Because the partner is not free to leave the store, the meal break will be paid. The partner should not punch out or in for the meal break, but instead should record the time of the meal break in the Punch Communication Log. Please consult the store manager for directions on recording a paid meal break on the Punch Communication Log.

11

CONFIDENTIAL

STAR_YORK001336

EXHIBIT F - Page 169