**LINKS: 88, 102, 103, 104**

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUMMER YORK, individually, and on behalf of other members of the general public similarly situated,<br><br>            Plaintiffs,<br><br>        v.<br><br>STARBUCKS CORPORATION, a Washington corporation, and STARBUCKS COFFEE COMPANY, a Washington corporation,<br><br>            Defendants. | **Case No. CV 08-07919 GAF (PJWx)**<br><br>MEMORANDUM & ORDER REGARDING MOTION FOR CLASS CERTIFICATION AND MOTIONS TO STRIKE |

## I.

## INTRODUCTION

This is a wage and hour case brought by Plaintiff Summer York ("York" or "Plaintiff") on behalf of Starbucks Corporation's ("Starbucks" or "the Company") California retail store employees ("employees" or "partners"[1]).  The pending complaint asserts claims based on the California Labor Code including alleged meal period, rest period, overtime, wage statement, and late final pay violations.  Plaintiff proceeds on the theory that Starbucks' labor assignment and management policies and procedures, all of which had the objective of minimizing labor costs, together with its customer

---

[1]Starbucks refers to all of its employees as "partners."  (York Decl. ¶ 2.)

service objectives on which manager's pay and promotion was partially based, incentivized managers to shortchange workers of their rights under the Labor Code. Plaintiff's motion claims that these policies and procedures "systematically generated the Labor Code violations alleged in this case . . . ."  In support of its motion to certify thirteen purported "subclasses" of California retail store employees, Plaintiff has submitted declarations of 500 employees who claim that they were denied one or more of statutorily mandated employment benefits.  Plaintiff also submits evidence of telephonic surveys that allegedly support her claim that certification is appropriate in this case.

Defendant offers evidence of corporate policies that mandate strict adherence to the requirements of the California Labor Code, of the steps taken by the company to enforce those policies, and of its actual compliance through 49 declarations of store employees who state that they received all benefits mandated by California law including their rest periods, meal breaks, and overtime pay.  Defendants also point to evidence from York herself indicating that in the several years that she worked at Starbucks she received the benefits mandated by California law on all but a few isolated occasions.  Finally, Defendants present evidence challenging the reliability of Plaintiff's survey due to flaws in methodology that have allegedly been conceded by one of Plaintiff's own experts.

The Court has conducted hearings in this case regarding class certification and has had the case under submission for an extended period of time.  During this period, the Court sought additional briefing from the parties concerning the Court's authority to modify a proposed class definition, reviewed supplemental authorities submitted by the parties on that subject, reviewed and reconsidered a motion for summary judgment based on changes in California law, and considered supplemental memoranda submitted by the parties regarding the potential impact of Wal-Mart Stores v. Dukes, 131 S.Ct. 2541 (2011) and Ellis v. Costco Wholesale Corp., 657 F.3d 970 (9th Cir. 2011) on class certification.

For reasons discussed in greater detail below, the Court concludes that, with one relatively minor exception, the motion for class certification should be denied. Plaintiff's personal experience and evidence submitted regarding the experience of other retail store employees belies any argument that Starbucks' operational policies "systematically generated" labor law violations. Plaintiff cannot show the degree of "commonality" described in <u>Dukes</u> and <u>Ellis</u> to satisfy the requirements of Rule 23, or to establish the predominance of common questions of law and fact. Moreover, the Court also notes that two of the purported "subclasses" involve claims that have not been pled in the Complaint and that the ten hour subclass fails because Plaintiff is not typical of the members of that class having only once in her career worked a ten hour shift. Accordingly, the motion is **GRANTED** as to the two-partner rule sub-class and **DENIED** as to all other proposed sub-classes.

## II.

## BACKGROUND

From January 15, 2003 to August 20, 2008, Plaintiff, a non-exempt hourly employee worked as a barista and a shift supervisor at seven different Starbucks store locations within California. (First Amended Compl. ("FAC") ¶ 17); (York Decl. ¶¶ 2, 6-7, 10-11, 15). During the course of her employment, Plaintiff alleges that the Starbucks stores were consistently busy and understaffed, and she regularly worked off-the-clock and frequently missed meal and rest breaks in order to keep up with customer service demands. (York Decl. ¶¶ 22, 24, 33, 36, 40.)

Following her termination from Starbucks on August 20, 2008, Plaintiff filed a class action lawsuit against the Company alleging that Starbucks's uniform store-level policies and procedures were causing unlawful labor conditions. (Docket No. 1, Compl.) Specifically, in her FAC, Plaintiff alleges the following Labor Code violations on behalf of herself and other California retail store employees: sections 510 and 1198 (unpaid overtime); sections 226.7 and 512(a) (unpaid meal period premiums); section 226.7 (unpaid rest period premiums); sections 1194, 1197, and 1197.1 (unpaid

3

minimum wages); sections 201 and 202 (wages not timely paid upon termination); section 204 (wages not timely paid during employment); sections 226(a) (non-compliant wage statements)[2]; and violation of Business & Professional Code section 17200, et seq. (Docket No. 15, FAC.)  She seeks recovery for herself and members of a class of employees who she claims were similarly situated.

## A. STARBUCKS'S OPERATIONAL POLICIES AND PROCEDURES

In support of her class certification motion, Plaintiff contends that the claims alleged in the FAC are amenable to class treatment because all Starbucks employees who suffered Labor Code violations were subject to the same policies and practices that are discussed below.  (Mem. at 1, 4-7.)

### 1. AUTOMATED LABOR SYSTEM ("ALS")

Managers at California Starbucks stores use a software program called ALS—along with employee availability forms and vacation requests—to create daily and weekly work schedules and to determine when employees were required to take meal and rest breaks.  (Plaintiff's Appx., Ex. A [Rutt Depo. at 56:19-57:19, 58:3-23, 59:1-7]; Ex. B [Decker Depo. at 14:15-23].)  The ALS software takes into account factors that might impact sales volume and the need for partners—such as past consumer activity and holidays—to determine the number of coverage hours and employees necessary for each shift.  (Id., Ex. A [Rutt Depo. at 60:4-17].)  In addition, ALS is also programed to schedule a partner's meal and rest breaks, and is able to repopulate and reschedule breaks based on changed circumstances.  (Id. at 57:20-58:1; Ex. B [Decker Depo. at 15:14-22, 35:11-25].)  More particularly, after the ALS system has determined, based on historical data regarding customer volume within a particular time period, the number of labor hours needed to meet the demands of a particular store,

---

[2]On August 5, 2011, this Court addressed Starbucks's motion for reconsideration, and granted, inter alia, the Company's motion for summary judgment on the issue of whether Plaintiff had suffered an "injury" within the meaning of Labor Code section 226(e).  (Docket No. 147, 8/25/11 Order at 6.)  Because of this, Plaintiff can no longer recover actual or statutory damages for her section 226(a) wage statement claim. See CAL. LAB. CODE § 226(e).

1  additional time is allocated for the statutorily mandated meal and rest breaks.  (Decker

2  Decl. ¶ 2.)[3]

3  **2. MANAGER BONUSES**

4  Under Starbucks's "Retail Store Management Incentive Plan" ("Incentive

5  Plan"), assistant store managers, store managers, and district managers, could earn

6  incentive pay, respectively, of 10%, 15%, and 20% of their eligible base pay based on

7  meeting four goals: (1) sales, (2) controllable contribution, (3) labor, and (4) customer

8  snapshot. (Plaintiff's Appx., Ex. F [Incentive Plan at 1369-1372].)  Pertinent here is the

9  "labor factor."  Every Starbucks store is allocated an ideal labor hour figure based on

10  the following data: (a) the historical performance of the store volume, (b) the hours of

11  the store, (c) the number of weekly shifts and the number of labor hours needed to cover

12  each of those shifts.  (Id., Ex. D [Lange Depo. at 43:6-15].)  A manager's bonus could

13  be negatively affected if the actual labor hours incurred in his or her store exceeded the

14  ideal labor hour figure for that store.  (Id. at 423:6-424:24); (see also Id., Ex. F

15  [Incentive Plan at 1370]) (showing the various percentages and net variances based on

16  failing to meet ideal labor hours).  However, actual labor hours constituted a single

17  element of the plan.  The plan also identified goals relating to store sales, controllable

18  contribution, and customer "snapshot" as important elements of a manager's incentive

19  plan.  (Id.)

20  **3. EMPLOYEE EVALUATIONS: "SPEED OF SERVICE" POLICY**

21  York contends that an employee's performance grade, which includes an

22  evaluation of performance under the "Speed of Service" policy, contributes to the Labor

23  Code violations alleged in the complaint.  The scoring methodology used to grade  an

24  employee's performance includes each customer's "wait time" which measures the

25

26  [3]York claims that, based on her experience as a barista and shift supervisor, ALS often failed to provide
enough coverage to keep up with customer service demands and often led to understaffing at Starbucks

27  stores. (York Decl. ¶¶ 20-22.)  However, she presents no evidence that the objective of the ALS system
was improper and little hard evidence to prove that the computer system failed to achieve an appropriate

28  management objective.  Rather, she offers impressionistic testimony that "it consistently felt like we were
understaffed."  (Id. ¶ 22.)

length of time it takes a customer to enter the store line and purchase a drink. (Plaintiff's Appx., Ex. H [Performance Measures at 0133].)  Employees can get from 0 to 16 points based on the total wait time: (1) 16 points if wait time is 3 minutes or less; (2) 13 points if between 3:01-3:30 minutes; (3) 10 points if 3:31-4:00 minutes; (4) 7 points if 4:01-4:30 minutes; (5) 4 points if 4:31-5:00 minutes; and (6) 0 points if 5:01 or greater minutes.  (Id.); (see also Id., Ex. G [Customer Snapshot Overview at 0128].) Again, however, this focuses only on a portion of the evaluation methodology. Starbucks' identifies several performance components to be included in an employee's evaluation including: (1) Service (which is broken down into sub-parts including register partner greeting, register partner eye contact, register partner closing, and similar considerations for baristas; (2) Product knowledge and neatness of the store employees; (3) Cleanliness of the store (which is measured with respect to eight components; and (4) Product quality which is again broken down into several components including beverage weight and temperature.  (Id.)  Nevertheless, Plaintiff contends that because of understaffing and the bonus incentives described above, Starbucks employees were regularly directed to work off-the-clock and were deprived of meal and rest breaks in order to meet the customer service demands created by the Three Minute Rule.  (Mem. at 5-7.)

### 4. TEN MINUTE RULE

Starbucks also has a policy that requires its stores to open ten minutes early and remain in operation ten minutes after closing.  (Plaintiff's Appx., Ex. I [Ten Minute Rule at 1].)  However, nothing in the Starbucks' policies or procedures indicates that time worked prior to the stated opening and closing times is not compensated.  As the discussion below indicates, the policy is to the contrary.

### 5. TWO PARTNER RULE

Under the "Two Partner Rule," Starbucks requires the presence of at least two partners in the store at all times.  (Id., Ex. J [Partner Guide at 047].)  According to the Partner Guide book, "[i]f a partner is scheduled for a meal break and only one other

partner is on shift, the partner should retire to the back of the store for the duration of his or her meal break."  (Id.)  Moreover, "[b]ecause the partner is not free to leave the store, the meal break [is] paid," (Id.), and "the partner required to remain in the store during the meal break will still be allowed to take at least 30 minutes to rest and eat. . . ."  (Id., Ex. K [Partner Resources Manual at 0261].)

### 6. POINT OF SERVICE ("POS")

The POS is an electronic system that records the hours worked by an employee.  (Id., Ex. A [Rutt Depo. at 37:8-21].)  The system has been in place at Starbucks since December 2, 2004.  (Id. at 45:2-7.)  Pursuant to this system, employees are not allowed to punch in more than five minutes before or five minutes after their scheduled shift unless they receive authorization from management.  (Id., Ex. L [Punching In/Out at 379].)  Moreover, if an employee punches out of the system for her thirty minute meal break, she is not allowed to punch back in before thirty minutes expire even if the employee returns back to work in the interim.  (Id., Ex. A [Rutt Depo. at 95:2-22].)  However, managers have the authority to correct the system and record the time that the partner worked in a Punch Communication Log.  (Id. at 48:1-10, 97:15-98:16.)

Since December 2, 2004, managers have been responsible for reviewing time entries before they were sent to the payroll department to ensure that there were no incorrect entries.  (Id. at 46:13-48:10, 51:7-15.)  This policy, however, changed on October 23, 2006, when Starbucks introduced a new procedure to its time-keeping process, and used what is called the "Meal Break Analysis Report" to determine the dates where there were meal break violations for each Starbucks employee.  (Id. at 84:1-24, 85:2-4; Ex. U [Sample Meal Break Analysis Report].)  Following this change, Starbucks required store managers to review the Meal Break Analysis Report while processing payroll.  (Id., Ex. A [Rutt Depo. at 84:19-24].)

### 7. FINAL PAYCHECK POLICY

1    Starbucks's "General Process Guide" indicates that the Separations Department
2    follows a sixty-two step procedure for processing an employee's final paycheck.  (See
3    Plaintiff's Appx., Ex. Q [General Process Guide].)  According to Jackie Gintz
4    ("Gintz"), a Starbucks senior payroll manager, the majority of the sixty-two steps in the
5    General Process Guide involve automated uploading of employee data, so that payroll
6    personnel can process multiple separations and paychecks simultaneously without
7    having to manually input information for every employee.  (Starbucks's Appx., Vol. 1,
8    Gintz Decl. ¶ 3.)  Because most of these steps are automated, Gintz explains that "the
9    processing typically involves six steps for a payroll employee to conduct: (i) enter the
10   separation from the store manager, (ii) enter the reported hours into the SAP system,
11   (iii) determine if any vacation hours are due, (iv) enter any such vacation hours, (v)
12   create the paycheck, and (vi) send out the paycheck."  (Id.)

13        Plaintiff contends in her memorandum that a design flaw in the General Process
14   Guide was causing Starbucks to routinely fail to timely pay employees their final
15   wages.  (Mem. at 22-23.)

16   **B. STARBUCKS' COMPLIANCE POLICIES**

17        Along with the operational policies and procedures described above, Starbucks'
18   corporate policy mandates that those operational procedures be carried out in strict
19   compliance with California labor laws.  With respect to meal and rest breaks, the
20   company's written policy states:

21   **Rest Breaks:** An hourly partner must be provided a paid rest period of
     no less than ten (10) minutes for each four hours worked.  The rest period
22   should be provided near the midpoint of each four-hour shift.  A rest
     period cannot be used to extend a meal period, or to leave early.

23   **Meal Breaks:** In California, a non-exempt partner (SM, ASM, shift
24   barista) must begin a full, uninterrupted 30-minute meal break before
     working five (5) consecutive hours.  If the partner does not get their meal
25   period prior to the first five (5) hours of their shift, they are eligible for a
     meal break penalty.

26   (Starbucks's Appx., Vol. 2, Ex. E, at 224.)  These policies are set forth in the Starbucks
27   "Partner Resource Practices California Specific" training manual for store managers.

28

1   (See Id. at 222; see also 227-29.)  The manual goes into great detail regarding the

2   payment of the meal break penalty for employees "who miss or take a late meal break."

3   (Id. at 224.)  The manual explains that "the break penalty is equal to one hour of the

4   partner's pay each time the partner misses *or* takes a late meal break."  (Id.) (Emphasis

5   in original.)  Thereafter, it explains in detail the procedure to be followed by a store

6   manager in insuring that the employee receives payment of the penalty.  (Id.; see also

7   228-29.)  These policies are described in both the "California Specific" training manual

8   and the broader corporate manual included in the record before the Court.  (Id.)

9   Starbucks' monitors compliance with this policy through its time keeping system which

10   is programmed to create a "Missed Meal" message at the time an employee, who has

11   worked more than five hours without a 30-minute meal break, punches out for the day.

12   (Decker Decl. ¶ 5.)

13          Starbucks also has an express policy that strictly prohibits employees from

14   working "off-the-clock."  (Starbucks' Appx., Vol. 2, Ex. E., Rutt Tr. at 71:19 - 72:16.)

15   The policy is articulated in the manual under the major heading "Recording Time

16   Worked" which contains subsections entitled "Use Time and Attendance to record all

17   time worked" and "Off-the clock work is strictly prohibited."  (Id., Ex. E., at 231.)

18   Under the first section, employees are advised, for example, that they should not punch

19   in until ready to work, that they must punch out at meal breaks and back in at the

20   conclusion of each break, that an employee "may not perform any work during a rest

21   break," that a partner must punch immediately upon the conclusion of a shift and that a

22   partner may not work pre- or post-shift unless punched into the system.  (Id.)  As to the

23   bar on off-the-clock work, the following section contains this admonition:

24              If a manager, assistant manager or shift supervisor instructs, encourages,
            or permits a partner to work any amount of time off the clock, the partner
25              must immediately report the violation to the store manager or district
            manager, as appropriate.  Managers, assistant managers or shift
26              supervisors who violate the time recording policy by instructing or
            permitting nonexempt partners to work off-the-clock will be subject to
27              corrective action, up to and including termination of employment.

28

> Under no circumstances will Starbucks retaliate against a partner for reporting violations of this time recording policy.
>
> A nonexempt partner who works off-the-clock voluntarily or pursuant to the orders of a manager, assistant manager or shift supervisor and fails to report the time worked will be subject to corrective action, including a verbal or written warning and a reminder of this time recording policy. . .

(Id.)  In short, Starbucks advises its employees that "time worked is time paid" and instructs them to capture those hours by properly punching in through the POS system. (Id. at 230; Rutt Tr. at 71:19 et seq.)  Errors in signing in or out or to correct any other timekeeping mistake are to be recorded through the Punch Communication Log.  (Id.)

## C.  DECLARATIONS BY PRESENT AND PAST STARBUCKS EMPLOYEES

### 1.  PLAINTIFF'S DECLARATIONS[4]

In support of her class certification motion, Plaintiff has submitted 500 declarations by present and past Starbucks employees.  (See Compendium of Class Member Declarations in Support of Plaintiff's Motion for Class Certification ("Plaintiff's Declarations"), Exs. 1-9.)  Taken in the aggregate, the declarations contain the following information that tends to be common to most if not all of them:

- Where only two employees were on duty, the two-partner rule precluded them from leaving the store premises during their meal breaks.

- Employees worked off-the-clock without compensation, and the POS timekeeping system prevented them from clocking-in and recording work performed during meal breaks.

- The Three Minute Rule prevented employees from taking adequate meal and rest breaks because they had to attend to customers that were in line and were not given a later break or compensated for the lost break.

- The Starbucks stores where they worked were busy and understaffed.

---

[4] The Court notes that the majority of the declarations closely resemble each other and appear to be based on a form that was prepared by counsel.  The Court also notes that the declarations when viewed individually present a considerably different picture than when lumped together with no consideration given to the specific foundation for each declarant's testimony.  For example, although some declarants complain of not having received meal and rest breaks on a regular basis, many others indicate that they only occasionally failed to receive such breaks and on a number of occasions were paid for missed meal breaks.  It appears that the significant variation among the declarants depended on the degree to which the local manager deviated from corporate policy.

- Managers directed employees to work during rest breaks, and employees were at times not paid premium compensation for having to do so.

- Meal breaks were interrupted and not for a full thirty minutes, or employees completely missed meal breaks during shifts of more than five hours.

- Employees were not paid an additional hour of compensation when they were unable to take a thirty minute meal break.

- Separated employees did not receive their final paycheck on their last day of employment or within three days thereafter if no notice of their intention to quit had been given.

(See Id.)

## 2. STARBUCKS' DECLARATIONS

In support of its opposition to Plaintiff's motion for class certification, Starbucks submitted 49 declarations of its own from current and former employees who have never been deprived of their statutory benefits under California law. These declarants state, inter alia, as follows:

- They were never required to take their meal breaks at the store because of the Two Partner Rule.

- They have never worked without getting paid, and that the POS timekeeping system has never prevented them from recording and getting paid for all time worked because the shift supervisor or store manager enters an authorization code to allow them to clock in.

- If a partner forgets to clock in, she simply enters the time she forgot to record on the computer in the Punch Communication Log.

- They were never asked to work off-the-clock.

- They either never or rarely missed meal and rest breaks.

- If they missed meal breaks, they were paid premium compensation.

- Their meal and rest breaks were never interrupted.

- Providing timely service to customers did not interfere with their meal and rest breaks.

(Starbucks's Appx. of Putative Class Member Decls., Exs. 1-49.)

In short, Starbucks points to employees who received their Labor Code mandated wage and hour benefits as a principal ground for asserting that this Court should deny the motion for class certification. These declarations are consistent with

11

the corporate policy of Starbucks to comply with California law.

**D.  YORK'S EXPERIENCE**

York worked in seven different Stabucks stores from January 2003 to August 2008.  She filed the present lawsuit after her employment with Starbucks was terminated.

### 1.  OFF-THE-CLOCK WORK

When hired, York received training on both her operational responsibilities (customer service, food handling and the like) and on company policies and procedures which were described in an employee handbook that she received.  (York Decl. ¶ 5.) Based on her training and experience, York knew that she was responsible for recording her work time within the POS system and that the purpose of doing so was to ensure that she was paid for all of the time she worked.  (Starbucks' Appx. Vol. 1, Ex. D [York Tr.], at 153-54.)  She also understood that even if she failed to clock in at the start of her shift, the POS system had a means of correcting that error through a manual entry.  (Id. at 154-55.)  York understood that Starbucks corporate policy barred "off-the-clock" work and that employees should be paid for all time actually worked for the company. (Id. at 158-59.)  Although York contends that she worked "off-the-clock" performing barista duties related to removing trash, cleaning the lobby, and checking the bathroom at the direction of "management" that "it would only be a minute or two," (Id. at 161), York conceded that she could not recall receiving such direction in those words or in words to that effect.  (Id.)  She likewise could think of no specific occasion when she was instructed not to use the punch communication log to record time worked off the clock.  (Id.)  Indeed, York indicated that when she did complain that she had worked off the clock without pay, she received the wages to which she was entitled.  (Id, at 166.)

### 2.  MEAL BREAKS

With respect to meal breaks, which are at the center of seven of the alleged subclasses identified by York, York was also well aware of the company's policy

1   mandating compliance with California law.  The record before the Court contains

2   York's time entries for the 580 shifts of five hours or more that she worked during her

3   tenure with Starbucks.  (Decl. Of Shanmung Muthukrishnan and Exhibits thereto.)

4   Those records reflect that, on all but eleven of those shifts, she took a meal break of 30

5   minutes or more.  (Id.)  Indeed, her own expert concluded that nearly 99 percent of the

6   shifts worked by potential class members were either less than five hours in length, and

7   therefore not eligible for a meal break, or that the records reflected that a meal break

8   was taken.  (Starbucks' Appx. Vol. 2, Ex. L [Fountain Decl.], at 329-30.)

9           The record also reflects that York's meal breaks were timely on most occasions.

10   Starbucks notes that in 2007 and 2008, York took only two meal breaks that

11   commenced after five hours of work, (Muthukrishnan Decl., ¶ 4 and Ex. A), and York

12   has acknowledged that the timing of her breaks and those of employees she supervised

13   was at times a matter of her preference. (Starbucks' Appx. Vol. 1, Ex. D, at 175-76.)[5]

14   Whether breaks were commenced early or late depended on "staffing and volume at that

15   time."  (Id. at 179.)   In short, York determined the timing of breaks, whether early or

16   late in a shift, so that all employees would be available during periods of high customer

17   volume.  (Id. at 175-79.)

18           With respect to ten hours shifts, the expert indicated that shifts in excess of 10

19   hours constituted two tenths of a percent of all shifts during the relevant time period.

20   (Id. at 331.)  Moreover, records of York's employment reflect that she only worked a

21   shift longer than ten hours once during her tenure.  (Muthukrishnan Decl., Ex. A, at 24;

22   Starbucks' Appx. Vol. 1, at 171-72.)

23   **3. REST BREAKS**

24           Starbucks policy provides for ten minute rest periods for each four hour work

25   period.  York states that she sometimes did not take rest breaks and at other times began

---

[5] The question of meal break timing, and whether a break must be taken at all so long as an employer provides an opportunity to take such a break, are matters that at this moment are before the California Supreme Court which heard argument in Brinker Restaurant Corp. v. Superior Court.

them late based upon customer volume and staffing levels at the time.  (Id. at 189.)
Although she states that she missed breaks "frequently," she was unable to estimate
how often they were missed.  (Id.)  As a shift supervisor, York never instructed an
employee to skip a meal or rest break, never directed an employee to take a break late,
never interrupted another employee's break, and never instructed another employee to
shorten his or her break.  (Id. at 196.)  York acknowledged that she could not recall a
single instance in which an employee was denied a proper rest break on a shift that she
worked, and that she never saw another manager instruct an employee to skip or delay a
break.  (Id. at 186-87; 196-97.)

### 4. FINAL PAYCHECK

York's employment was terminated on August 20, 2008, in a meeting with
Carolyn Dach.  (Id. at 198.)  They met at another Starbucks location where Dach
delivered York's final paycheck.  (Id. at 199.)  York was paid for work performed
through August 18, 2008, which was her last day of work.  (Id. at 200.)  Starbucks
acknowledges an error that resulted in certain compensation to which York was entitled
not being included in the check.  (Oppos. at 5:27-6:2.)

### III.

### PROPOSED CLASS DEFINITIONS

As indicated above, York has identified 13 purported sub-classes of California
employees on whose behalf she seeks recovery in this case.  The following lists the
proposed sub-classes.[6]

Subclass No. 1:  "Short Meal Period"

Consists of all individuals employed by Starbucks as café attendants, baristas,
and/or shift supervisors within California, at any time between December 2, 2004 and

---

[6]The Court sought the parties' positions regarding the Court's authority to redefine a class definition in connection with its consideration of a motion for class certification.  The Court agrees with Plaintiff's position that redefinition is permitted, but has not redefined any of the proposed subclasses in this case.

the date class certification is granted.  (Theriault Decl. in Support of Plaintiff's Motion for Class Certification  ¶ 7.)  This subclass is likely to have over 100,000 members. (Id.)

Subclass No. 2:  "Late and Missed Meal Period"

Consists of all individuals employed by Starbucks as café attendants, baristas, and/or shift supervisors within California at any time between December 2, 2004 and the date class certification is granted, and who have time records that indicate shifts of more than five hours without a 30-minute meal period taken before the fifth hour and no corresponding premium payment.  (Id. ¶ 8.) This subclass is likely to have over 100,000 members.  (Id.)

Subclass No. 3: "No Meal Premium Practice"

Consists of all individuals employed by Starbucks as café attendants, baristas, and/or shift supervisors within California at any time between December 2, 2004 and August 1, 2006, and who have time records that indicate an uncompensated meal period violation.  (Id. ¶ 9.)  This subclass is likely to have over 40,000 members.  (Id.)

Subclass No. 4: "Unfair Meal Period Practices"

Consists of all individuals employed by Starbucks as café attendants, baristas, and/or shift supervisors within California at any time between December 2, 2004 and December 31, 2008, and who worked shifts of more than five hours.  (Id. ¶ 10.)  This subclass is likely to have over 100,000 members.  (Id.)

Subclass No. 5: "10 Hour Meal Period"

Consists of all individuals employed by Starbucks as café attendants, baristas, and/or shift supervisors within California at any time between December 2, 2004 and the date class certification is granted, and who worked shifts of more than ten hours. (Id. ¶ 11.)  This subclass is likely to have over 5,000 members.  (Id.)

Subclass No. 6: "Two Partner Rule"

Consists of all individuals employed by Starbucks as café attendants, baristas, and/or shift supervisors within California at any time between December 2, 2004 and

the date class certification is granted, and who took a meal break as one of the only two employees in the store.  (<u>Id.</u> ¶ 12.)  This subclass is likely to have over 50,000 members.  (<u>Id.</u>)

<u>Subclass No. 7: "Meal Violation Admission"</u>

Consists of all individuals employed by Starbucks as café attendants, baristas, and/or shift supervisors within California at any time between December 2, 2007 and the date class certification is granted, and who received a meal period premium payment.  (<u>Id.</u> ¶ 13.)  This subclass is likely to have over 10,000 members.  (<u>Id.</u>)

<u>Subclass No. 8: "Work During Meal Period"</u>

Consists of all individuals employed by Starbucks as café attendants, baristas, and/or shift supervisors within California at any time between December 2, 2004 and the date class certification is granted.  (<u>Id.</u> ¶ 14.)  This subclass is likely to have over 100,000 members.  (<u>Id.</u>)

<u>Subclass No. 9: "Work Before and After Shift"</u>

Consists of all individuals employed by Starbucks as café attendants, baristas, and/or shift supervisors within California at any time between December 2, 2004 and the date class certification is granted.  (<u>Id.</u> ¶ 15.)  This subclass is likely to have over 100,000 members.  (<u>Id.</u>)

<u>Subclass No. 10: "Denied Rest Period"</u>

Consists of individuals employed by Starbucks in hourly paid positions within California at any time between December 2, 2004 and the date class certification is granted.  (<u>Id.</u> ¶ 16.)  This subclass is likely to have over 100,000 members.  (<u>Id.</u>)

<u>Subclass No. 11: "Non-Compliant Wage Statement"</u>

Consists of all individuals employed by Starbucks in hourly paid positions within California at any time between December 2, 2007 and the date that class certification is granted.  (<u>Id.</u> ¶ 17.)  This subclass is likely to have over 25,000 members.  (<u>Id.</u>)

<u>Subclass No. 12: "Late Final Pay"</u>

1    Consists of all individuals employed by Starbucks within California between

2    December 2, 2007 and the date of class certification, whose employment with Starbucks

3    ended and who were issued a check for wages one or more days after discharge or more

4    than three days after resignation.  (Id. ¶ 18.)  This subclass is likely to have over 25,000

5    members.  (Id.)

6    Subclass No. 13: "Involuntary Termination"

7    Consists of all individuals employed by Starbucks within California between

8    December 2, 2007 and the date of class certification, who were terminated and who

9    were issued a check for wages one or more days after discharge.  (Id. ¶ 19.)  This

10   subclass is likely to have over 12,5000 members.  (Id.)

11   Some of the sub-classes will not be considered in connection with the discussion

12   below.  First, with respect to proposed sub-class No. 11, the Court recently ruled on the

13   merits of the claim on a motion for reconsideration of an earlier ruling on Starbucks'

14   motion for summary judgment.  Because the Court ruled in favor of Starbucks and

15   concluded that the wage statement claim failed as a matter of law, it will not certify sub-

16   class No. 11.

17   The Court also denies certification to sub-class No. 5 – the 10-hour shift class –

18   because York worked only one such shift during her entire tenure with Starbucks and

19   therefore lacks a sufficient basis for showing typicality with other class members.[7]

20   Finally, with respect to proposed sub-classes No. 4 – a "meal break premium'

21   sub-class – York bases the claims of this sub-class on an implied-in-fact contract theory

22   that has not been alleged in the operative complaint.  Likewise, sub-class No. 7, the so-

23   called "meal violation admission" sub-class, seeks a recovery on the basis of a theory

24   not found in the operative complaint.  Starbucks objects to having these sub-classes

25   considered in connection with the Court's ruling on the motion for class certification.

26   (Oppos. to Motion for Class Certif. [Docket No. 105], at 7.)  In reply, York argues only

27

28   [7]The Court notes that the "commonality" analysis discussed below also applies to the foregoing two sub-classes.  That provides an additional ground for not certifying sub-classes No. 5 and No. 11.

that her complaint seeks meal period premiums and PAGA penalties and therefore Starbucks had fair notice that York would seek recovery of such amounts on behalf of these sub-classes.  (Reply [Docket No. 112], at 14 n. 12 & 15 n. 14.)   The Court agrees that the First Amended Complaint does not give adequate notice of the claims that underly the motion to certify these sub-classes.  The fact that the FAC references particular code sections and identifies specific violations is not enough to support a motion for class certification.  A similar argument was presented and rejected by Judge Henderson in Bibo v. Federal Express, Inc., 2009 WL 1068880 *7 (N.D.Cal. 2009).  In that case, Plaintiff sought to certify a subclass on the basis that violations that had already been identified would result in additional violations of Labor Code Sections 203 and 226.  The Court rejected the argument because the operative complaint, as in this case, had not contained specific allegations in support of the claims.  It therefore refused to certify the sub-class.  In the Court's view, certification of the proposed sub-class No. 4 and sub-class No. 7 contain the same defect and on that basis alone should not be certified.[8]

The Court will, therefore, consider the motion for class certification with respect to proposed sub-class Nos. 1, 2, 3, 6, 8, 9, 10, 12 and 13.  However, before turning to the merits of the class certification motion, the Court first addresses a significant evidentiary issue that bears on certification.

## IV.

## EXPERT TESTIMONY

Starbucks moves to strike the Becky Wu ("Wu") and Robert Lewis Fountain ("Fountain") declarations based on Rule 702 of the Federal Rules of Evidence.  (Docket

---

[8]Because these proposed sub-classes purportedly describe meal period sub-classes, they suffer from the same defects discussed below regarding the meal period claims.  Accordingly, like those discussed below, they would also fail for lack of commonality and a failure to establish the predominance of common questions of law and fact.

Nos. 103, 104.)[9]  These declarations relate to survey evidence that Plaintiff presents to

support her motion to certify the multiple sub-classes.  Based on the reasons discussed

in greater detail below, the Court concludes that the evidence is not reliable, **GRANTS**

Starbucks's motions and **STRIKES** these declarations.

**A.  RULE 702 AND *DAUBERT***

Rule 702 of the Federal Rules of Evidence sets forth the standard governing the

admissibility of expert testimony in federal courts.  The rule provides that "a witness

qualified as an expert by knowledge, skill, experience, training, or education, may

testify thereto in the form of an opinion or otherwise" where "scientific, technical, or

other specialized knowledge will assist the trier of fact to understand the evidence or to

determine a fact in issue."  FED. R. EVID. 702.  The proponent of expert testimony bears

the burden of proving its admissibility.  Cooper v. Brown, 510 F.3d 870, 942 (9th Cir.

2007).

Expert testimony is admissible under Rule 702 only if it is relevant and reliable.

To determine the reliability of expert testimony, a district court may consider a number

of factors, including whether "(1) the testimony is based upon sufficient facts or data,

(2) the testimony is the product of reliable principles and methods, and (3) the witness

has applied the principles and methods reliably to the facts of the case."  FED. R. EVID.

702 (emphasis added).  To meet that test, "an expert may not adopt another's data

without verifying the validity and reliability of that data . . . ."  O2 Micro Intern. Ltd. v.

Monolithic Power Sys., Inc., 420 F. Supp. 2d 1070, 1088 (N.D. Cal. 2006).  Further, the

U.S. Supreme Court in Dukes recently suggested that Daubert v. Merrell Dow Pharms.,

Inc., 509 U.S. 579, 597 (1993) ("Daubert I") should be applied to expert testimony at

the class certification stage.  See Dukes, 131 S.Ct. 2553-54 ("The District Court

concluded that Daubert did not apply to expert testimony at the certification stage of

class-action proceedings.  We doubt that is so. . . .") (citation omitted).

---

[9]Starbucks also moves to strike Plaintiff's Trial Plan.  (Docket No. 102.)  The Court neither grants nor
denies this motion at the current stage of the proceedings.

Daubert made clear that the district court performs an important "gatekeeping" function when it determines the admissibility of expert testimony. Daubert, 509 U.S. at 597 (1993) ("Daubert I"); see also Cooper, 510 F.3d at 942. Thus, "'[a] trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability.'" Cooper, 510 F.3d at 942 (quoting Elsayed Mukhtar v. California State Univ., 299 F.3d 1053, 1064 (9th Cir. 2002)). In determining admissibility, a court must focus "solely on principles and methodology, not on the conclusions that they generate." Daubert I, 509 U.S. at 595. In other words, a court's task "is to analyze not what the experts say, but what basis they have for saying it." Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1316 (9th Cir. 1995) ("Daubert II").[10]

**B. APPLICATION**

### 1. WU DECLARATION

The Court first considers Starbucks's motion to strike the Wu declaration. In the case at hand, Plaintiff retained Wu as an expert to design and administer a survey in connection with the pending class certification motion. (Wu Decl. ¶ 2.) Plaintiff also retained John Krosnick ("Krosnick") to prepare a report "regarding the potential value of conducting a survey of class members in this case to ascertain information about their activities at work." (Krosnick Decl. ¶ 2.) Krosnick, who has extensive experience in the area of collecting and analyzing survey data, explains in his declaration that for a survey to be conducted properly and accurately, it must comport with established procedures. (Id. ¶¶ 8, 13, 31.) Krosnick described those procedures in his declaration.

In the pending motion to strike, Starbucks contends that Wu's survey is unreliable because it grossly deviated from the best practices outlined in Krosnick's report. (Docket No. 103, Mem. at 1.) The Court agrees. After evaluating the Wu and

---

[10]The Court notes, however, that a conclusion that deviates substantially from those of other experts in the field might suggest that a method is unreliable or that it has been applied in an unreliable manner. See General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997); Lust v. Merrell Dow Pharmaceuticals, Inc., 89 F.3d 594, 598 (9th Cir. 1996).

Krosnick declarations and deposition testimonies, it is evident that, in a number of important respects, Wu failed to comply with well established principles and procedures designed to insure the reliability of survey data.  For example:

(1) Wu failed to hold a focus group to become familiar with the language naturally used by the population to be interviewed.  (Krosnick Decl. ¶ 23); (Starbucks's Appx. of Evidence in Support of Motion to Strike Wu Decl. ("Evidence to Strike Wu Decl."), Knopp Decl., Ex. 2 [Wu Depo. at 100:16-21, 107:5-22]).

(2) Wu failed to pre-test the survey questions on individuals outside of Plaintiff's firm to see how respondents may misunderstand the questions that were to be asked during the telephone interviews.  (Krosnick Decl. ¶ 24); (Evidence to Strike Wu Decl., Knopp Decl., Ex. 2 [Wu Depo. at 100:8-15]).

(3) Prior to the first contact, Wu failed to mail a letter to each of the interviewees explaining the purpose of the study and informing them that they should expect a telephone call from an interviewer in the near future.  (Krosnick Decl. ¶ 63); (Evidence to Strike Wu Decl., Knopp Decl., Ex. 2 [Wu Depo. at 2-13]).

(4) Wu failed to provide the interviewees with a financial incentive for participating in the survey.  (Krosnick Decl. ¶ 63); (Evidence to Strike Wu Decl., Knopp Decl., Ex. 1 [Krosnick Depo. at 128:6-11]; Ex. 2 [Wu Depo. at 116:7-15]).

(5) Wu completed her survey in about two weeks instead of the recommended time period of two months.  (Krosnick Decl. ¶ 70); (Evidence to Strike Wu Decl., Knopp Decl., Ex. 2 [Wu Depo. at 117:15-118:24]).

(6) Wu failed to reach each potential respondent at different times of the day because she conducted interviews only between the hours of 4 p.m. and 9 p.m., instead of from 9 a.m. to 9 p.m., as recommended by Krosnick.  (Krosnick Decl. ¶ 64); (Evidence to Strike Wu Decl., Knopp Decl., Ex. 1 [Krosnick Depo. at 135:3-12]; Ex. 2 [Wu Depo. at 121:5-7]).

(7) Wu failed to follow up with interviewees who initially refused to participate in the survey.  (Krosnick Decl. ¶ 64); (Evidence to Strike Wu Decl., Knopp Decl., Ex. 1 [Krosnick Depo. at 135:19-137:5]; Ex. 2 [Wu Depo. at 140:18-24]).

(8) During Wu's survey, she instructed interviewers to stop contacting potential respondents after they completed a total of 500 surveys, which was contrary to Krosnick's guidelines for properly conducting telephone surveys.  (Evidence to Strike Wu Decl., Knopp Decl., Ex. 1 [Krosnick Depo. at 56:7-22]; Ex. 2 [Wu Depo. at 68:3-69:16, 70:1-14].)

(9) Wu did not assure respondents that their names would remain confidential, as recommended by Krosnick.  (Krosnick Decl. ¶ 66); (Evidence to Strike Wu Decl., Knopp Decl., Ex. 2 [Wu Depo. at 137:19-138:4]).

(10) Wu did not ask respondents to affirm their commitment to telling the truth at the start of the interview, as advised by Krosnick.  (Krosnick Decl. ¶ 67); (Evidence to Strike Wu Decl., Knopp Decl., Ex. 2 [Wu Depo. at 132:1-137:18]).

21

(11) Wu did not ask the respondents whether they had been exposed to information about the case prior to the survey.  (Krosnick Decl. ¶ 72); (Evidence to Strike Wu Decl., Knopp Decl., Ex. 1 [Krosnick Depo. at 121:22-122:23]; Ex. 2 [Wu Depo. at 105:8-11]).

(12) Wu did not retain an independent firm to verify whether the respondents had been contacted.  (Krosnick Decl. ¶ 72); (Evidence to Strike Wu Decl., Knopp Decl., Ex. 2 [Wu Depo. at 142:13-20]).

(13) Wu failed to include in her report the response rate, the number of potential interviewees not reached, and the number of incomplete or terminated interviews.  (Evidence to Strike Wu Decl., Knopp Decl., Ex. 1 [Krosnick Depo. at 146:7-22]; Ex. 2 [Wu Depo. at 151:4-152:8, 164:1-8].)

Indeed, Krosnick even confirmed during his deposition testimony that a number of the questions asked by Wu during her survey were improper, biased and/or ambiguous.  (Evidence to Strike Wu Decl., Knopp Decl., Ex. 1 [Krosnick Depo. at 93:6-111:12].)  In short, Plaintiff's own witness demonstrates that Wu failed to apply reliable methods in conducting her surveys and developing conclusions on the basis of the data she developed through those surveys.  Thus, in light of Wu's numerous departures from established survey procedures and practices, the Court finds her survey unreliable, and thus **STRIKES** her declaration.

## 2. FOUNTAIN DECLARATION

Starbucks also moves to strike the Fountain declaration.  (Docket No. 104, Not.) Fountain was retained as an expert by Plaintiff's firm to review and analyze a sample of time and wage records in connection with the pending motion for class certification. (Fountain Decl. ¶ 2.)  In its motion, Starbucks contends that Fountain's declaration is unreliable because: (a) Fountain did not know the source of the data he used during his analysis; (b) he was unsure if the data was accurate; and (c) the data used included information about Starbucks employees who were not members of the meal break subclass.  (Id., Mem. at 1-2.)  The Court agrees that these defects render Fountain's opinions unreliable.

The Court begins with Fountain's opinion regarding alleged violations in connection with an employee's final pay.  In developing that opinion, Fountain used data prepared by a company called "Statco" for the separation and final pay dates.

(Curiel Decl., Ex. A [Fountain Depo. at 57:9-19].)  However, at various points during his deposition, Fountain made candid admissions that he knew nothing about the process for determining the final pay dates, and that these dates might have been erroneous.  (Id. at 57:17-19, 64:1-17.)  Specifically, when Fountain was asked whether he knew if the final pay dates that he used for his analysis were correct, he answered:

> At this point I don't have any way of verifying those numbers.  And to the extent that some of the final pay dates might be erroneous then these exact counts might not be accurate and might change somewhat.  If the number of incidents where that final paycheck was not for wages or premiums or other things that were due at the date of separation, there – there may be some reduction in these numbers.

(Id. at 64:6-14.)

The Court finds these admissions remarkable.  Case law plainly holds that an expert cannot adopt another's data without verifying its validity and reliability.  See O2 Micro Intern. Ltd., 420 F. Supp. 2d at 1088.  The O2 Micro case provides an excellent example of how an expert should exercise control over the data on which he relies.  Id. No such care was exercised in this case with the result that Fountain was forced to concede that he may have relied on inaccurate data.  And it turns out, the content of that data is material to the issue on which Fountain opined.

As explained by Starbucks, because an employee may have received several checks after his or her separation date, the very last paycheck that an employee received may not have been the check for his or her "wages," as defined by California Labor Code section 200, but rather a check for gains in a Stock Investment Plan or Bonus Retail Plan.  (Mem. at 4); see, e.g., Int'l. Bus. Machs. Corp. v. Bajorek, 191 F.3d 1033, 1038 (9th Cir. 1999) (stating that stock options do not fall within section 200's definition of "wages").  Thus, an employee might have received his final check for "wages" within the requisite time period under California Labor Code section 201 or 202 which would absolve Starbucks of any liability, and subsequently receive two more checks that are not considered "wages" within the definition of section 200.  Under these circumstances, if Fountain relied on the incorrect check for purposes of

23

determining the "final pay date," his statistics would be faulty and unreliable.  Thus, given Fountain's admission that he made no effort to insure the reliability of the final pay data, the Court concludes that his final pay opinion is not reliable.

In addition, Fountain's meal break opinion is unreliable as well because it is based in part on irrelevant data.  Fountain analyzed time records for employees who worked at 100 Starbucks' stores, a sample that was provided to him by Plaintiff's counsel.  (Ex. B to Fountain Decl.)[11]  The sample admittedly contained data regarding all employees at those stores, including store managers and assistant store managers who cannot be part of any meal break class, and Fountain acknowledged that, when calculating the percentage of employees who experienced meal break violations, he considered all employees who work at those stores.  (Curiel Decl., Ex. A [Fountain Depo. at 85:8-86:1].)  Given the radically different rules that apply to the meal break rights of store managers and assistant store managers, Fountain necessarily relied on data that may have skewed his results and created a misleading impression of conduct toward class members.  As noted in Starbucks' motion to strike this declaration, Fountain has admitted:

– he had no knowledge of how his findings would change if the sample had been limited to those actually in the proposed class;

– he could not say what percentage of employees in the sample were store managers or assistant store managers;

– he had no idea whether the managers and assistant managers might have made up a disproportionate number of persons who worked the longer shifts;

– if asked to perform the same analysis over again, he would have made sure that the data he analyzed did not include the time records for managers.  (See

---

[11]The text identifies major problems with the opinion regarding this data, but the Court also notes that it has been unable to satisfy itself from the record developed by the parties (which is voluminous) that the sample is free of other sampling errors besides the inclusion of management personnel in the data.  That fact also undermines any confidence that the Court might have in the data on which Fountain's opinions were based.

24

1  Curiel Decl., Ex. A [Fountain Depo. at 91:19-92:12].)

2  (See Motion to Strike [Docket No. 104], at 6-7.)

3  York submits three basic arguments in support of her effort to salvage the

4  Fountain opinions.  First, she contends that reliability is relatively unimportant at the

5  class certification stage.  (Oppos. To Motion to Strike [Docket No. 108] , at 3 ("robust

6  gatekeeping" not required at the class certification stage).  Whatever support may have

7  existed for that proposition, the proposition has not survived Dukes and Ellis.  The

8  Supreme Court in Dukes did not squarely address the point but, in response to the

9  district court's conclusion that Daubert did not apply at the certification stage, wrote

10 "[w]e doubt that this is so."  131 S.Ct. at 2554.  Ellis confirmed that the district court's

11 application of Daubert to the expert testimony presented in that case was proper, but

12 criticized the trial court for confusing the Daubert admissibility test with the "rigorous

13 analysis" required to establish commonality.  657 F.3d at 982.[12]  As noted in In re Visa

14 Check/MasterMoney Antitrust Litig., 280 F.3d 124, 135 (2d Cir.2001), evidence that is

15 sufficiently unreliable that it would not be admitted at trial "should not be considered in

16 determining whether the requirements for class certification have been met."

17 York also offers statistical evidence developed by her counsel to prove that

18 Fountain's errors were inconsequential.  Counsel is not a witness in this case and the

19 Court will not consider his declaration which is plainly offered as an expert opinion in

20 support of the motion to certify.  Even if adopted by Fountain, the Court would be

21 disinclined to accept the evidence in consideration of the motion to certify.  See In re

22 TMI Litig., 193 F.3d 613, 697-98 (3rd Cir. 1999) (exclusion of expert opinion based on

23 counsel's summaries affirmed).

24 Furthermore, the Court is persuaded that, even if considered as part of the

25

26 [12]An example of the pre-Dukes/Ellis approach is reflected in Kurihara v. Best Buy Co., 2007 WL
27 2501698, *5 (N.D. Cal. 2007) where the trial court took the view that conflicting evidence need not be
   weighed, that no inquiry should be made into merits issues, and that "robust gatekeeping" of expert
28 testimony is not  required.

25

record, the information used to supplement Fountain's declaration does not alter the fundamental flaws identified above.  With respect to meal breaks, counsel has provided information regarding the percentage of managers in the total population (nine percent) but not in the sample, which, as discussed above and in a footnote, may not be representative.  Further, the information fails to delineate whether and to what extent managers and assistant store managers work more shifts than their subordinates.  If managers, as one might suspect, work a higher percentage of shifts than employees who essentially work part-time, then the database may be off by far more than the nine percent error assumed by Plaintiff's counsel.  The Court notes similar, perhaps even more severe defects, associated with the effort to cure flaws in the final paycheck opinions.

Accordingly, the Court concludes that Fountain's opinions regarding alleged final pay and meal break violations should not be given any weight in ruling on the class certification motion.  Because those opinions are based on irrelevant and potentially incorrect data, the Court **STRIKES** his declaration as well.

**V.**

**CLASS CERTIFICATION**

**A.  THE SUBSTANTIVE CLAIMS**

On behalf of the numerous sub-classes described above, Plaintiff seeks recovery for violations of the California Labor Code provisions that establish the rules for meal breaks, rest periods, overtime pay, and delivery of final paychecks.  The Court commences with a brief discussion of the substantive law before turning to the question of certification of the proposed classes.

**1.  MEAL AND REST BREAKS**

California law mandates that employers provide meal and rest breaks for employees who work a specified number of hours.  The basic rules are set forth in California Labor Code section 512(a) which states:

An employer may not employ an employee for a work period of more than five

hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee.  An employer may not employ an employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived.

CAL. LAB. CODE § 512(a); see also 8 Cal. Code Regs. § 11020(11).[13]  There are consequences to an employer who fails to meet these obligations.  On that subject, California Labor Code section 226.7 provides:

(a) No employer shall require an employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission.

(b) If an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided.

CAL. LAB. CODE § 226.7.  The employer's obligations and the consequences of default in meeting those obligations is reiterated in the California Code of Regulations § 11020(12) which states:

(A) Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period.

---

[13](A) No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and the employee.

(B) An employer may not employ an employee for a work period of more than ten (10) hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived.

(C) Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked. An "on duty" meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to. The written agreement shall state that the employee may, in writing, revoke the agreement at any time.

(D) If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided.

1

2

> The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 1/2) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages.

3

4

5

> (B) If an employer fails to provide an employee a rest period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided.

6

7

Id. § 11020(12).

8

At present, California law is in a state of uncertainty as to what an employer

9

must do to "provide" meal and rest breaks.  Intermediate courts of appeal have split as

10

to whether the employer must insist that the employee actually take meal and rest

11

breaks, or whether it is sufficient to establish a policy that allows the employee to

12

determine whether or not to take the break.  See Jaimez v. DAIOHS USA, Inc., 105 Cal.

13

Rptr. 3d 443, 457 (Ct. App. 2010) and cases cited therein.  This issue is currently under

14

review by the California Supreme Court in Brinker Restaurant Corp. v. Superior Court,

15

80 Cal. Rptr. 3d 781 (2008).   However, district courts in this circuit have

16

overwhelmingly taken the view that the statutory obligation to "provide" an employee

17

with a meal or rest break means only that the break be made available, not that the

18

employer must ensure that the employee actually take the break.  E.g., Brown v. Federal

19

Express Corp., 249 F.R.D. 580, 586 (C.D.Cal. 2008) and cases cited therein.  In the

20

Court's view, such an interpretation is consistent with the text of the relevant statutes

21

and regulations, and furthers the objectives of the legislation without imposing

22

unreasonable burdens on employers.  As noted in Brown:

23

24

25

26

27

> Requiring enforcement of meal breaks would place an undue burden on employers whose employees are numerous or who, as with Plaintiffs, do not appear to remain in contact with the employer during the day. See White v. Starbucks Corp., 497 F.Supp.2d 1080, 1088-89 (N.D.Cal.2007). It would also create perverse incentives, encouraging employees to violate company meal break policy in order to receive extra compensation under California wage and hour laws. Id. In the absence of California Supreme Court precedent, this Court must apply the rule it believes the court would adopt under the circumstances.

28

Id. at 585.  For these reasons, the Court concludes that Starbucks was obligated to

28

"provide" meal and rest breaks by making them available, not demanding that they be taken.

### 2. OFF-THE-CLOCK WORK

Under California law, an employer must pay an employee for all "hours worked," which is defined as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." Morillion v. Royal Packing Co., 995 P.2d 139, 141 (Cal. 2000) (quotation omitted). Under this rule, an employer is deemed to have "suffered or permitted [an employee] to work" if it knew or should have known that its employees were working off-the-clock. Id. at 145. "Thus, a plaintiff may establish liability for an off-the-clock claim by proving that (1) he performed work for which he did not receive compensation; (2) that defendants knew or should have known that plaintiff did so; but that (3) the defendants stood 'idly by.'" Adoma v. University of Phoenix, Inc., 270 F.R.D. 543, 548 (E.D. Cal. 2010) (citing Lindow v. United States, 738 F.2d 1057, 1060-62 (9th Cir. 1984)). In other words, an employer who has knowledge that an employee is performing tasks for the benefit of the employer must either take steps to see that the work is not performed or pay the employee for the time spent performing those tasks. Royal Packing, 995 P.2d at 145.

### C. FINAL PAYCHECKS

California Labor Code section 201(a) provides: "If an employer discharges an employee the wages earned and unpaid at the time of discharge are due and payable immediately." CAL. LAB. CODE § 201(a). Labor Code section 202(a) states in pertinent part that "[i]f an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting." Id. § 202(a). Finally, "[i]f an employer willfully fails to pay, without abatement or reduction, in accordance with [sections 201 and 202], any wages of the

1   employee shall continue as a penalty from the due date thereof at the same rate until

2   paid or until an action therefor is commenced; but the wages shall not continue for more

3   than 30 days." Id. at § 203(a).

4   **B. CLASS CERTIFICATION UNDER RULE 23**

5        Rule 23 of the Federal Rules of Civil Procedure sets forth the requirements for

6   certifying a class action. Case law construing the rule holds that, before granting a

7   motion to certify, the Court must conduct a "rigorous analysis" to ensure that the four

8   requirements of Rule 23(a) are met and that the class fits within one of the three

9   categories of Rule 23(b). Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 161 (1982);

10  Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1233 (9th Cir. 1996). The party

11  seeking certification bears the burden of proof with respect to these requirements.

12  Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186, as amended, 273 F.3d 1266

13  (9th Cir. 2001). "Plaintiff can meet this burden by providing the Court with a sufficient

14  basis for forming a 'reasonable judgment' on each requirement." Haley, 169 F.R.D. at

15  647 (quoting Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975)).

16       In deciding a motion to certify a class, the court may not evaluate whether the

17  plaintiff is likely to prevail on the merits of the stated claims. Eisen v. Carlisle &

18  Jacquelin, 417 U.S. 156, 177-78 (1974); Staton v. Boeing Co., 327 F.3d 938, 954 (9th

19  Cir. 2003). "[P]laintiff is not required to prove the merits of the class claim on a motion

20  for certification, or even to establish a probability that the action will be successful."

21  Haley, 169 F.R.D. at 647 (citing Eisen, 417 U.S. at 177-78; Valentino, 97 F.3d at 1231-

22  32; Blackie, 524 F.2d at 901). However, the court *must* consider evidence relating to

23  the merits to the extent that such evidence bears on the requirements of Rule 23. Ellis,

24  657 F.3d at 981; Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992). The

25  Court explores this latter point in greater detail in its discussion of Ellis v. Costco

26  below.

27       **1. THE REQUIREMENTS OF RULE 23(A)**

28       Rule 23(a) requires that: (1) the class be so numerous that joinder of all

members is impracticable ("numerosity"); (2) there be questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties be typical of the claims or defenses of the class ("typicality"); and (4) the representative parties fairly and adequately protect the interests of the class ("adequacy").

### a. Numerosity

To establish numerosity, a plaintiff must show that the represented class is so numerous that joinder of all members is impracticable.  See FED. R. CIV. P. 23(a)(1); Bates v. United Parcel Serv., 204 F.R.D. 440, 444 (N.D. Cal. 2001).  However, "impracticable" does not mean impossible; it refers only to the difficulty or inconvenience of joining all members of the class.  See Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913 (9th Cir. 1964).  "Because no exact numerical cut-off exists, the specific facts of each case must be examined to determine if impracticability exists."  Haley, 169 F.R.D. at 647 (citing Gen. Tel. Co. v. EEOC, 446 U.S. 318, 330 (1980)).  When the class is not so numerous, courts should consider other factors such as "the geographical diversity of class members, the ability of individual claimants to institute separate suits, and whether injunctive or declaratory relief is sought."  Jordan v. Los Angeles Cnty., 669 F.2d 1311, 1319 (9th Cir. 1982), vacated on other grounds, 459 U.S. 810 (1982).

This element is not seriously in dispute.  Here, Plaintiff has submitted a declaration indicating that the likely number of class members in each of the subclasses range from 5,000 to 100,000 members.  (Theriault Decl. ¶¶ 8, 11, 15-16, 18.)  Based on this, Plaintiff contends that the subclasses meet the numerosity requirement.  (Mem. at 7.)  The Court agrees.  Circuit law teaches that a class as little as thirty-nine individuals is large enough to satisfy the numerosity requirement.  Jordan, 669 F.2d at 1319 (in considering the certification of three proposed subclasses, the court noted that it "would be inclined to find the numerosity requirement in the present case satisfied *solely* on the basis of the number of ascertained class members, i.e., 39, 64, and 71") (emphasis added).  Because Plaintiff's proposed subclasses each contain thousands of individuals,

1  the Court finds that the numerosity requirement has been satisfied.

2                  ***b. Typicality***

3         Typicality exists when "the claims or defenses of the representative are typical

4  of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3).  "Under the rule's

5  permissive standards, representative claims are 'typical' if they are ***reasonably co-***

6  ***extensive*** with those of absent class members; ***they need not be substantially identical***."

7  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998) (emphases added).  To

8  make this assessment, the Court looks to "'whether other members have the same or

9  similar injury, whether the action is based on conduct which is not unique to the named

10  plaintiffs, and whether other class members have been injured by the same course of

11  conduct.'"  Hanon, 976 F.2d at 508 (quoting Schwartz v. Harp, 108 F.R.D. 279, 282

12  (C.D. Cal. 1985)).  In other words, "the test is that the class representative 'must be part

13  of the class and possess the same interest and suffer the same injury as the class

14  members.'"  Haley, 169 F.R.D. at 649 (citations omitted).  This requirement is meant to

15  assure that the interests of all class members are sufficiently interrelated that the

16  interests of absent class members will be adequately protected in their absence.  General

17  Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 158 n.13 (1982).

18         Starbucks essentially concedes typicality with one exception.  With respect to

19  the 10 Hour Meal Period sub-class, Starbucks argues that the typicality element has not

20  been established because during Plaintiff's employment, she only worked one shift

21  longer than ten hours during her tenure with the company.  (Opp. at 8.)  Specifically,

22  Starbucks contends that because Plaintiff's "experience concerning second breaks is so

23  limited . . . she cannot provide a full hearing on their claims by prosecuting her own,

24  and thus is not typical."  (Opp. at 8.)  The Court takes note that, in her deposition

25  testimony, she could not even recall whether she had ever worked a ten-hour shift and

26  was able to say only that she had once worked a shift of more than eight hours.

27  (Starbucks's Appx., Vol. 1, Muthukrishnan Decl., Ex. A [Time Punch Data at 24];

28  Curiel Decl., Ex. D [York Depo. at 115:15-25].)

1  The Court agrees that York has failed to establish the typicality requirement

2  with respect to the 10 Hour Meal Period sub-class.   Her single experience is

3  insufficient to show that her experience was typical of others who worked these longer

4  shifts, and York has presented no evidence to support a contrary finding.  Accordingly,

5  the Court concludes that the 10 Hour Meal Period sub-class cannot be certified due to a

6  failure of Plaintiff to establish a claim typical of that class.

7  As to the remaining sub-classes, the Court notes that the typicality and

8  commonality requirements "tend to merge," Falcon, 457 U.S. at 158 n. 13,  and will

9  address issues that might have some connection to the typicality analysis under the

10  commonality heading.

11  ### c. Commonality

12  A plaintiff can meet the commonality requirement if "there are questions of law

13  *or* fact common to the class."  FED. R. CIV. P. 23(a)(2) (emphasis added).  In light of

14  recent decisions from the United States Supreme Court and the Ninth Circuit Court of

15  Appeals, this Court concludes that the commonality element of Rule 23 has not been

16  satisfied and that the classes therefore cannot be certified.  Dukes, 131 S.Ct. 2541; Ellis,

17  657 F.3d 970.

18  ### (1) Wal-Mart Stores v. Dukes

19  The United States Supreme Court in Dukes recently addressed the standard for

20  determining commonality, emphasizing the obligation of the trial court to conduct a

21  "rigorous analysis" of the class allegations to assure that certification is proper under the

22  facts and circumstances presented.  In Dukes, the Court considered whether the

23  commonality element for certifying a class action was adequately established in a sex

24  discrimination case brought by a nationwide class of female employees who alleged that

25  Wal-Mart "discriminated against them on the basis of their sex by denying them equal

26  pay or promotions in violation of Title VII of the Civil Rights Act of 1964. . . ."  Dukes,

27  131 S. Ct. at 2547.  In its decision, the Court first observed that the presence of some

28  common questions in any given case is insufficient to establish "commonality" as

33

required under Rule 23 because in every case there will be common questions such as whether all of the plaintiffs worked for the same employer and whether there were unlawful employment practices. Id. at 2551. But that is only the beginning because,

> [r]eciting these questions is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury. This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways—by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. ***Their claims must depend upon a common contention***—for example, the assertion of discriminatory bias on the part of the same supervisor. ***That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke***.

Id. (emphasis added). In short, the question, according to the Supreme Court, is not whether common questions, "even in droves," can be raised but the capacity of the class proceeding to generate "common *answers* apt to drive the resolution of the litigation." Id. at 2551. (Emphasis in the original.) That requires a close scrutiny into the class allegations and even, in some circumstances, consideration of merits questions to determine whether the lawsuit can generate common answers that are likely to resolve the case. Id. at 2551-52. On this subject, the Supreme Court concluded:

> Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question why was I disfavored.

Id. at 2552.

Ultimately, the Court concluded that the commonality element was not met in that case. Id. at 2557. In so doing, the Court evaluated the record, and determined that, other than introducing evidence that Wal-Mart had a policy of "allowing discretion by local supervisors over employment matters," the plaintiffs had failed to identify "a common mode of exercising discretion that pervade[d] the entire company. . . ." Id. at 2554-55 (emphasis omitted). But the exercise of discretion on the part of local

supervisors in potentially different ways, Id. at 2254, in light of a nationwide corporate policy mandating compliance with the requirements of Title VII and other non-discrimination rules and regulations, Id. at 2553, led the Court to conclude that "demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's." Id. at 2254. Quoting from Judge Ikuta's dissent from the Ninth Circuit's en banc decision in Dukes, the Court wrote:

> As Judge Ikuta observed in her dissent, "[i]nformation about disparities at the regional and national level does not establish the existence of disparities at individual stores, let alone raise the inference that a company-wide policy of discrimination is implemented by discretionary decisions at the store and district level." 603 F.3d, at 637. A regional pay disparity, for example, may be attributable to only a small set of Wal–Mart stores, and cannot by itself establish the uniform, store-by-store disparity upon which the plaintiffs' theory of commonality depends.

Id. at 2255. The Court therefore concluded that the class should not have been certified because Plaintiffs had failed to identify a "'specific employment practice'—much less one that ties all their 1.5 million claims together," and failed to provide "convincing proof of a companywide discriminatory pay and promotion policy. . . ." Id. at 2556.

### (2) Ellis v. Costco Wholesale Corp.

Following Dukes, the Ninth Circuit was presented with an appeal involving the certification of a class of employees who claimed gender discrimination in Costco's promotion and management practices. The district court had certified a class that "'consists of all current and former female Costco employees nationwide who have been denied promotion to GM or AGM or denied promotion to Senior Staff positions since January 3, 2002.'" 657 F.3d at 977.[14] In light of Dukes, the circuit vacated the district court's ruling as to commonality because it had "failed to conduct the required 'rigorous analysis' to determine whether there were common questions of law or fact among the class members' claims." Id. at 974.

---

[14]Because the Court certified a broader class than that requested by Plaintiffs, the parties later stipulated to a narrower class definition, although Costco did not stipulate to the certification of that class. 657 F.3d at 977-78 & nn. 2,3.

The Court began with an assessment of the standard employed by the district court and found that the record on that issue was unclear, particularly with respect to the court's obligation to assess merits issues that bear on the class certification analysis.  On that point, the circuit wrote:

> Regardless of whether the district court applied an erroneous standard, we take this opportunity to clarify the correct standard. As we explained above, the merits of the class members' substantive claims are often highly relevant when determining whether to certify a class. More importantly, it is not correct to say a district court may consider the merits to the extent that they overlap with class certification issues; rather, a district court must consider the merits if they overlap with the Rule 23(a) requirements. Wal–Mart, 131 S.Ct. at 2551–52; Hanon, 976 F.2d at 509.

657 F.3d at 981.  That does not mean that the Court must resolve merits disputes.  As the circuit observed:

> As an initial matter, we agree that the district court was not required to resolve factual disputes regarding: (1) whether women were in fact discriminated against in relevant managerial positions at Costco, or (2) whether Costco does in fact have a culture of gender stereotyping and paternalism. However, the district court was required to resolve any factual disputes necessary to determine whether there was a common pattern and practice that could affect the class *as a whole*. If there is no evidence that the entire class was subject to the same allegedly discriminatory practice, there is no question common to the class. In other words, the district court must determine whether there was "significant proof that [Costco] operated under a general policy of discrimination." Wal–Mart, 131 S.Ct. at 2553 (alteration omitted).

Id. at 983.  (Footnotes omitted; emphasis in original.)  By way of example, the opinion notes that the question of whether gender discrimination was confined to two of eight regions goes to the issue of commonality because one would expect a biased attitude on the part of top management to be reflected nationwide.  Id.  If a disparity were shown in only two of eight regions, it would indicate that nationwide discrimination does not exist and that certification of a nationwide class would not be appropriate.

Because the district court had not engaged in a rigorous analysis on that point, it did not meet its obligation to insure that Rule 23's commonality requirement had been met.  The Ninth Circuit, adhering to the Supreme Court's mandate in Dukes, vacated the ruling and remanded for further proceedings.

### (3) Application to Wage and Hour Litigation

Neither <u>Dukes</u> nor <u>Ellis</u> gave any indication that their decisions were based on the fact that the substantive claims involved employment discrimination.  On the contrary, both cases plainly emphasized the obligation of the trial court to conduct a "rigorous analysis" to insure that Rule 23's commonality requirement was met.  This principle applies in all cases, not just discrimination cases.  If there could be any doubt on the subject, the Supreme Court put the matter to rest with a brief order in <u>Chinese Daily News, Inc. v. Wang</u>, 2011 WL 1237957 (2011), a wage and hour case brought under the FLSA and the California Labor Code.  The district court certified multiple classes with respect to both state and federal claims and ultimately entered judgment for employees after trial, 2008 WL 1805834 (C.D. Cal., Feb. 27, 2008); the Ninth Circuit affirmed.  <u>Wang v. Chinese Daily News, Inc.</u>, 623 F.3d 743 (9th Cir. 2010).  The Supreme Court issued the following order:

> Judgment vacated, and case remanded to the United States Court of Appeals for the Ninth Circuit for further consideration in light of <u>Wal–Mart Stores, Inc. v. Dukes</u>, 564 U.S. ——, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011).

2011 WL 4529967 (2011).  Obviously the order does not say much, but it plainly indicates that <u>Dukes</u> applies to wage and hour cases just as it would apply to any other class action lawsuit.[15]  The Court therefore must be guided by the strong admonitions found in both <u>Dukes</u> and <u>Ellis</u>.

### (4) Discussion

This case suffers from the same flaws identified in both the <u>Dukes</u> and <u>Ellis</u> opinions.  First, as discussed above, Starbucks has adopted national corporate policies that mandate full compliance with labor laws regarding wage and hour requirements of the type reflected in the FLSA and the California Labor Code.  Moreover, the record discloses that Starbucks' policies acknowledge and account for differences in California

---

[15]Starbucks' Second Supplemental Memorandum in Opposition to Plaintiff's Motion for Class Certification [Docket No. 152] at 2 n. 1 identifies several district court cases that have now applied <u>Dukes</u> in wage and hour litigation.

law that mandate somewhat different procedures at stores operated within this state. This is reflected in the document bearing the title "Partner Resource Practices California Specific."  In the context of the present dispute these policies are analogous to Wal-Mart and Costco's corporate-wide anti-discrimination policies that mandate compliance with Title VII and other anti-discriminatory legislation.  In this context, the Court must therefore explore why there may have been violations of California law in the face of these policies, which requires an inquiry into whether the question can be answered through "a corporate-wide . . . common pattern and practice that could affect the class *as a whole.*"  657 F.3d at 983.  As the Ninth Circuit concluded:

> If there is no evidence that the entire class was subject to the same allegedly [unlawful wage and hour] practices, there is no question common to the class. In other words, the district court must determine whether there was "significant proof that [Starbucks] operated under a general policy of [denying employees their rights under the California Labor Code]."

Id.

The Court's rigorous analysis of the record before it persuades the Court that Plaintiff has failed to establish common patterns and practices that could affect any of the proposed sub-classes as a whole.  The Court first examines the operational policies for evidence of a corporate wide policy of depriving employee's of their Labor Code rights.

### (i) Operational Policies

Plaintiff's reliance on Starbucks' operational policies to make this showing has not persuaded the Court, which views those policies as typical of general operational policies one would expect in any large organization.  For example, Starbucks uses a computerized labor allocation system – ALS – to determine the needs of each store based on that store's historical experience for the day, date and time of year among other things.  The system includes an algorithm that allows it to schedule employee meal and rest breaks and further enables it to alter and reschedule breaks based on changed circumstances.  As noted above, this system first determines the labor hours

needed at a particular store and then increases the time allocated to allow for statutorily mandated meal and rest breaks.  One can hardly imagine a serious argument challenging this methodology, which permits Starbucks to efficiently allocate employee hours to its vast network of retail stores.  Computers have transformed the ability of businesses to gather and analyze historical data and to use that data to project all sorts of future needs including staffing needs at retail locations.  Their use in the highly competitive food service industry is likely essential for survival.

Likewise, Starbucks "speed of service" policy reflects precisely the sort of approach that one would expect from a business that promotes a high level of customer service and whose profit depends both on servicing a large volume of customers in a short period of time with the objective of developing a high percentage of repeat customers.  Again, one would expect that any business that depends in part on getting customers their morning coffee would take steps to encourage employees to insure that customers were not required to endure a long wait.  It is therefore not at all unusual that employees would be evaluated, *in part*, on their efficient delivery of customer service. But the implication that this is the only factor, or the principal factor, in an employee's evaluation grossly overstates the case.  As noted above, there are other important elements to the evaluation of employees, and all of these elements exist as part of a broader policy that insists on compliance with all state and federal wage and hour laws.

Finally, Plaintiff contends that the computerized allocation of labor hours and emphasis on customer service, when taken together with management bonus incentives, all work to defeat the company's labor policies and encourage violation of California law.  This position fails to account for the multiple factors that Starbucks takes into account in evaluating and compensating its management staff.  Although the "labor factor" is undoubtedly (and properly) an element of a manager's incentive pay plan, there are several other important variables, and all of them coexist with the manager's obligation to insure that employees receive their meal breaks, their rest breaks and pay for all hours worked.  In focusing on this single element in the management evaluation

process, she fails to mention that managers are expressly instructed that the failure to provide for meal and rest breaks and a practice of permitting off-the-clock work will result in discipline up to and including termination. Thus, the Starbucks' labor policies contain significant disincentives intended to discourage low level management employees from taking unfair advantage of retail store employees.

### (ii) Statistical Evidence

More importantly, Plaintiff's own evidence tends to show that her contention – that Starbucks' operational policies have created pervasive violations of California labor law – has not been established. As noted above, the Court has granted motions to strike the survey evidence and the statistician's opinions because of significant flaws in methodology. Without that evidence, the Court is left with anecdotal evidence, which may not be at all representative of the whole, indicating that on at least some occasions violations of California law occurred. But even if the Court admitted the statistician's opinion,[16] it does not help in the search for a "common answer" to the basic questions of why certain alleged violations occurred. For example, in the case of meal and rest breaks the statistical evidence cannot begin to show whether a break was skipped because a manager forbade the employee from taking it or whether it was not taken as a matter of individual choice. Thus, the statistical evidence presented does not reveal whether deviations from corporate policy resulted from a corporate-wide policy and procedures or a small percentage of individual managerial decisions in contravention of corporate policy. The Court discusses these defects in further detail in connection with the violations alleged in the operative complaint.

### (iii) Meal and Rest Breaks

Plaintiff seeks to certify nine sub-classes that involve claims based on meal breaks (first, second, third, fourth, fifth, sixth, seventh, eighth) and rest breaks (tenth)

---

[16]The Court excludes the survey evidence from this discussion because the methodology was so deeply flawed that the Court views it as meaningless.

violations.  As discussed elsewhere, the Court has rejected certification of the fifth sub-

class, which seeks recovery for a class of employees who worked 10 hour shifts because

Plaintiff is cannot meet the "typicality" requirement as to that sub-class.  As to the

fourth and seventh sub-classes, the Court has also indicated that they fail because they

were not adequately identified in the FAC.  Nonetheless, the discussion below

effectively addresses issues presented by each of the meal and rest period sub-classes.

With respect to the alleged meal break violations, around which makes up the

majority of Plaintiff's claims, Plaintiff's own statistical expert testified in deposition

that on nearly 99 percent of the more than 1,500,000 shifts that were within his

database, either no meal break was required or a 30 minute meal break was taken.  (See

II.D.2, supra.)  With respect to the meal periods that were taken by employees, the

violations largely relate to the timing of the meal period.  Thus, even assuming that the

data submitted by Fountain were sufficiently reliable to be admitted, it does not and

cannot show why any particular meal break was taken at a particular time and, more to

the point, whether the break was taken at a time preferred by the employee for whatever

reason or was mandated by a manager who ignored the requirement that he provide his

subordinates with a timely meal break.

York's own experience provides useful insight.  York worked 580 shifts during

the relevant period and took meal breaks on all but 11 (1.9%) of them.  (Id.)  Most of

those breaks were timely; as noted in 2007 and 2008 only two breaks commenced after

five hours of work, and York herself acknowledged that, as a shift supervisor, she timed

her employee breaks to address the immediate needs of her store on any given work

day.  (Id.)  Thus, York's own experience belies the assertion that Starbucks operated

under a corporate-wide policy of depriving employees of timely meal breaks.  Her

experience tends to show what one would expect at a business like Starbucks – that on

occasion the momentary need to service customers affects the timing of an employee's

breaks.

Starbucks anecdotal evidence, in the form of 500 declarations from the more

41

than 100,000 employees who worked during the relevant time period, describe widely differing experiences that again undermines a claim that some uniform corporate policy is at work to deprive employees of their meal breaks.  Some declarants say they were frequently denied meal breaks, others say that this happened only occasionally.   They had similar experiences with rest breaks.  Starbucks, on the other hand, offered a small number of declarations of its own from employees who declare that they always received their meal and rest breaks in a timely fashion.  What this evidence shows is that members of the purported class had widely differing experiences, that the corporate policy mandating *compliance* with the California Labor Code was widely enforced, but that some managers, in some locations, on some occasions, apparently deviated from that policy for reasons that no doubt vary from location to location.

Starbucks correctly notes that the crucial question in this case for those who did not receive meal breaks, or did not receive timely breaks, is whether any violation of California law occurred in the first place and, if so, why the violation occurred given Starbucks' lawful policy mandating compliance with California labor laws.  Starbucks notes that York herself indicated that whether an employee took a proper meal break depended on who was running the shift (she emphasized that she always insisted that her subordinates received a proper meal break) which indicates that violations resulted from individual action and not a corporate-wide policy or practice.  Likewise, she testified that she sometimes tooks breaks early, and at other times late, depending on her preference given the circumstances that existed within the store at the time.  Thus, an evaluation of a meal break claim as to any individual would involve a variety of particularized factors that would not necessarily impact any other company employee.

The rest break claim suffers from the same defects and does not require much additional discussion.  California law requires that employers "authorize and permit" employees to take a 10 minute rest break for each four hours worked.  As discussed above, as with meal breaks, the employer's obligation is to make them available, not force employees to take them.  In a similar case out of this district, a plaintiff sought to

certify a rest break class in litigation against McDonald's.  <u>Kimoto v. McDonald's</u>
Corp., 2008 WL 4690536 (C.D.Cal. 2008).  In addressing the issues discussed here
under the "predominance" element of Rule 23, the Court concluded that class
certification was not appropriate because, among other things, the rest break claims
were too fact specific and would require detailed individualized inquiry to resolve the
dispute between the parties.  Again, York's testimony indicates that a similar situation
exists in this case where, as with meal breaks, whether and when an employee took a
rest break was dependent on the manager who was in charge of the shift.  And whether
an employee was interrupted during a break turned on the many variables that could
affect the demands placed on employees at any given time during the work day.
Starbucks points out that even some of Plaintiff's witnesses confirmed the
"idiosyncratic circumstances" under which their rest breaks were interrupted.  (Oppos.
to Motion for Class Certification [Docket No. 105], at 15-16.)  This evidence shows that
the reasons why employees may have missed breaks has less to do with corporate policy
and much more to do with individual circumstances.

In short, because there is no common answer to the "why" question with respect
to each of the violations alleged as to the meal and rest break sub-classes, <u>Dukes</u>, 131
S.Ct. at 2551, the evidence does not present "significant proof that [Starbucks] operated
under a general policy of [denying its employees meal and rest breaks]."  657 F.3d at
983.  Commonality has not been established as to those sub-classes.

### (iv) Two-Partner Sub-Class

The Court separately analyzes what Plaintiff describes as the so-called "two
partner rule" sub-class, which supposedly has more than 50,000 members.  This sub-
class involves a claim that the company's requirement that no employee ever be left
alone in a Starbucks store forces an employee to take their meal break in the store which
prevented them from leaving during their break.  This proposed sub-class presents a
much closer question on the question of commonality.

Plaintiff contends that anyone working at Starbucks in a two-partner situation

should be paid a meal break premium.  Plaintiff bases is argument on the following regulation:

> Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an 'on duty' meal period and counted as time worked. An 'on duty' meal period shall be permitted only when the nature of the work prevents an employee from being relief [sic] of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to." Cal.Code Regs., tit. 8, § 11040, subd. 11(A); *see also* DLSE Enforcement Manual at § 45.2.3(2)(a); DLSE Opinion Letter 2002.09.04 (burden rests on the employer to establish criteria justifying on-duty meal periods).

(Motion for Class Cert. [Docket No. 88-1], at 15.  Plaintiff contends that, under the two-partner rule, a Starbucks employee should be considered "on duty" during his or her meal break and therefore entitled to compensation.  Starbucks responds that the record indicates that this is an extremely rare situation and that more than 90% of Starbucks' stores have three or more employees present when breaks are scheduled.  (Decker Decl. ¶¶ 3-4).

Perhaps, but even if true Starbucks' argument is beside the point under the analytic framework delineated in <u>Dukes</u> and <u>Ellis</u>.  Whether the sub-class is large or small does not answer the question of whether there is a common answer to the reason that a group of employees were deprived of their meal break benefit.  This proposed sub-class consists of a group of employees who, under Plaintiff's theory, are entitled to compensation and other remedies because of a corporate-wide policy that caused a violation of California labor law.  At this stage it is not for the Court to determine the merits of York's claim that these class members were required to take "on duty" meal breaks for which they were not compensated.  That question will remain for another day.  But at this stage York has shown that there is a common answer to the "why" question, which supports a finding of commonality.  Thus, while under all other circumstances discussed above commonality is lacking, in this situation the commonality inquiry mandated by <u>Dukes</u> and <u>Ellis</u> appears to have been met.

### (v) Off-the-Clock Work Sub-Class

The ninth sub-class purportedly includes all employees who worked before the

44

beginning and after the termination of his or her shift.  The eighth sub-class also involves off-the-clock work because it encompasses allegedly uncompensated work during meal periods.  For the reasons discussed above regarding California law regarding meal periods and the individualized reasons why an employee may have not received any meal period or taken a shortened meal period, the Court concludes that the commonality requirement cannot be shown for the purpose of any claim under the California Labor Code.  This discussion therefore focuses on the ninth sub-class claims.

Starbucks has a clear and unambiguous corporate policy mandating that all employees be paid for work performed for the company.  York contends that, contrary to that policy, employees worked before and after their shifts without compensation.  To establish such a claim, York must show that Starbucks "suffered or permitted" an employee's unpaid work.  Under California law:

"Work not requested but suffered or permitted is work time. For example, an employee may voluntarily continue to work at the end of the shift.... The employer knows or has reason to believe that he is continuing to work and the time is working time. [Citations.]" (29 C.F.R. § 785.11 (1998).) "In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed." (29 C.F.R. § 785.13 (1998).) Although our state cases have not interpreted the phrase, federal cases have discussed the meaning of "suffer or permit to work" defining "[e]mploy" under the FLSA. (29 U.S.C. § 203(g).) " '[T]he words "suffer" and "permit" as used in the statute mean "with the knowledge of the employer." ' [Citation.] Thus an employer who knows or should have known that an employee is or was working overtime must comply with the provisions of [29 U.S.C.] § 207 [maximum hours]." ( Forrester v. Roth's I.G.A. Foodliner, Inc. (9th Cir.1981) 646 F.2d 413, 414; see also 29 C.F.R §§ 785.11, 785.13.)

Morillion v. Royal Packing Co., 22 Cal.4th 575, 585 (2000).  In other words, proof of an off-the-clock claim requires proof that the employer had actual or constructive knowledge that York performed work for which she was not paid.  White v. Starbucks Corp., 497 F.Supp.2d 1080, 1083 (N.D.Cal. 2007).

In a similar case brought by another Starbucks employee in the Northern District, plaintiff sought class certification of an off-the-clock work claim on behalf of assistant managers.  Koike v. Starbucks Corp., 2008 WL 7796650 (N.D.Cal. 2008).  In

45

support of her motion for class certification, she argued that assistant store managers

required more than 40 hours a week to perform their jobs, that local budgets precluded

or limited the amount of overtime permitted, managers were incentivized to restrict

overtime, and the computerized labor allocation system fails to allot enough time to

perform all of their weekly tasks.  Id. at *7  The district court noted that, even if true:

> The propositions Koike attempts to establish would not prove that a
> single assistant store manager had worked off the clock. Even if these
> propositions were true and they created an inference that assistant
> managers would be inclined or incentivized to work off the clock,
> significant individual fact determinations would be required to establish
> that in fact this occurred for it does not follow that simply because
> assistant store managers had an incentive to work off the clock that they
> actually did so and that Starbucks knew of such off-the-clock work.

Id. at *8.  The district court went on to observe that "Starbucks has demonstrated that

even if assistant managers and their supervisors were partially incentivized to work off

the clock or to permit or require off-the-clock work, these incentives would be

countered by a well-established and clear policy prohibiting off-the-clock work."  Id.

The district court therefore refused to certify the class because it found that individual

questions predominated over any common questions of law and fact.  The Ninth Circuit

affirmed.  Koike v. Starbucks Corp., 378 Fed.Appx. 659 (9th Cir. 2010).

      The record before this Court establishes the strongly worded Starbucks policy

that "time worked is time paId."  But the policy goes much further: it expressly

prohibits employees from working during breaks and bars working before or after the

completion of a shift unless punched into the time keeping system.  Nonexempt

employees who persist in working off-the-clock are subject to discipline; likewise those

employees are instructed to report managers who encourage or require off-the-clock

work.  And managers who instruct or permit their subordinates to work off-the-clock

are subject to discipline including termination.  In view of this policy and the rationale

of Dukes and Ellis, York must present evidence of a systematic corporate-wide practice

of forcing employees to work off-the-clock to meet Rule 23's "commonality"

requirement.  The record will not support such a finding.

Again, the Court looks first to York's own experience with Starbucks.  York was well aware of all of the corporate policies regarding time recording and of the procedure for entering unrecorded time in the "Punch Communication Log."  (E.g., Starbucks' Appx. Vol. 1, Ex. D [York Dep. Tr.], at 158-59, 162).  York concedes that she was never told to perform work without receiving pay, and was never told that she should not use the Punch Communication Log to record time worked off-the-clock.  (Id. at 161).  It should not be surprising then that, to the extent that she now claims that she worked off-the-clock without pay, her managers deny knowledge of the claim.[17]  Thus, the resolution of her claim, let alone the claims of any other employee, will require individualized proof that she in fact did the work, why she did the work, why she did not use the Punch Communication Log (and the reasons for her failure), and whether her managers had reason to know that she was in fact working without pay.  Moreover, evidence from York's witnesses buttresses the Court's view that the off-the-clock work claim would require an inquiry into the individual circumstances under which an employee worked without pay.  (See Opposition to Motion for Class Certification [Docket No. 105], at 18-19.)   In short, whether an employee worked without pay, the reasons why the employee worked without pay, the reasons why that employee failed to record the time on the Punch Communication Log, and the knowledge that a manager did or did not have regarding the employee's unpaid work can only be answered on the basis of individualized proof.  Commonality has not been shown because the record belies any contention that there is a common answer to the "why" question.

### (vi) Late Final Pay Sub-Class/Involuntary Termination Sub-Class

---

[17] York was able to recall a specific instance when she was asked to perform a task after she had punched out, but when asked why she failed to record post-shift time through the Punch Communication Log she did not say that she was barred from doing so by her manager.  Rather, she said that she did not record her time on that occasion because "she didn't think of it."  (Id. at 162).  She also acknowledged that she made demands on some occasions to be paid for a missed meal break, and that she was compensated for that time.  (Id. at 166.)

These two sub-classes involve persons whose employment was terminated, either voluntarily or involuntarily, during the class period.  They are largely derivative of the other claims discussed above – that if an employee worked off-the-clock or was not provided a meal or rest break as required by law, then money would be due and owing that was not included in the final paycheck delivered to the employee.[18]  First, the Court notes that whether or not any such payments were due would involve individualized determinations as set forth above with respect to all but the members of a single sub-class.  Moreover, Starbucks contends that these sub-classes cannot be certified because whether or not wages were due upon termination requires individual consideration in each case.  Starbucks asserts that the claim cannot be pursued where there is a "good faith dispute" over whether wages were in fact due, and that this requires a case-by-case assessment.  Furthermore, citing Labor Code § 203, Starbucks argues that it cannot be held liable in damages and penalties for late final pay unless the violation was willful.

The Court has already addressed the late final pay issue in its original ruling on Starbucks' motion for summary judgment.  The Court concluded, based on the text of Labor Code § 203, that a late final pay claim requires a finding of willfulness and more particularly that Starbucks must have known that its final paychecks did not include all wages due and intended such a result.  Judge Wright has reached the same conclusion although in a different context than that now before this Court.  Elliot v. Starbucks, Inc., CV 07-924, Docket No. 56, at 10 (C.D.Cal., Nov. 7, 2007).  The Court here concluded that, even in York's circumstances, she would have to prove willfulness at trial to prevail on her late payment claim, and that, on that issue, there were genuine issues of material fact that could not be decided on motion.[19]

---

[18]To be sure, an error was made in York's final paycheck which delayed her receipt of vacation pay and certain "reporting time" pay.  Stabucks concedes this error.

[19]The Court also notes that York seeks to counter Starbucks' arguments with citation to survey and expert testimony that the Court has stricken.  To that extent, her arguments lack any support in the evidentiary record.

For these reasons, the Court concludes that "commonality" as that term has been described in <u>Dukes</u> and <u>Ellis</u> has not been and cannot be satisfied as to these two proposed sub-classes. Accordingly, they cannot be certified.

### (vii) Conclusion as to Commonality

For the reasons discussed above, the Court concludes that most of York's case fails to meet the commonality element of Rule 23. That alone would be sufficient to deny class certification as to all but the two-partner sub-class discussed above. However, the Court will briefly discuss the remaining elements of Rule 23 in the interest of making a complete record.

### d. Adequacy

To satisfy the requirement of adequacy, Plaintiff must establish (1) that she does not have a conflict of interest with the proposed classes; and (2) that she is represented by qualified counsel. <u>Hanlon</u>, 150 F.3d at 1020 (citations omitted); <u>see also</u> <u>Haley</u>, 169 F.R.D. at 649-50.

Here, Plaintiff has satisfied the adequacy requirement. Plaintiff has provided a declaration stating that she has dedicated substantial time to this action, worked closely with her attorneys, and, as a class representative, will continue to work to the best of her abilities to prosecute the action on behalf of the class. (York Decl. ¶ 50.) Moreover, Plaintiff has also listed in her declaration the duties of a class representative, (<u>Id.</u> ¶ 51), which shows that she understands her responsibilities. In addition, there are no facts to suggest that there is a conflict of interest between Plaintiff and any of the class members.

Next, the law firm representing Plaintiff, Initiative Legal Group APC ("Initiative"), is qualified for a class action lawsuit. Initiative was founded in 2002 and has established a large wage and hour class action practice in California. (Primo Decl. ¶ 1.) Moreover, the firm has provided a long list of class action cases that it has successfully certified over the years. (<u>Id.</u>)

Thus, the Court finds that the adequacy requirement has been established in this

49

action.

## 2. THE REQUIREMENTS OF RULE 23(B)

In addition to satisfying the requirements of Rule 23(a), a party seeking certification must also demonstrate that the proposed class meets one of the requirements of Rule 23(b). Zinser, 253 F.3d at 1186. Here, Plaintiff seeks to satisfy Rule 23(b)(3). "[C]ertification pursuant to Rule 23(b)(3) . . . is appropriate 'whenever the actual interests of the parties can be served best by settling their differences in a single action.'" Hanlon, 150 F.3d at 1022 (citation omitted). Before certifying a class under this subsection, a court must determine that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3). These questions are interrelated because "[i]mplicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." Valentino, 97 F.3d at 1234; Haley, 169 F.R.D. at 650.

### a. Predominance

The predominance requirement is "far more demanding" than the commonality requirement of Rule 23(a). Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997). "The predominance inquiry of Rule 23(b)(3) asks 'whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" In re Wells Fargo Home Mortg. Overtime Pay Litig., 571 F.3d 953, 957 (9th Cir. 2009) (quoting Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1162 (9th Cir. 2001)). "The focus is on 'the relationship between the common and individual issues.'" In re Wells Fargo, 571 F.3d at 957 (quoting Hanlon, 150 F.3d at 1022).

For the same reasons that the Court found that York has not established the commonality element, it follows that she cannot show that common questions of law and fact predominate. Determining whether a given employee suffered a meal or rest

break violation will largely depend on numerous highly fact-specific inquires as to the reason why the employee did not take a break, such as, who was running the shift at a particular café, the employee's personal preferences, customer volume, and the number of staff at each Starbucks store.  Indeed, as discussed above, the record shows that whether an employee received his or her Labor Code benefits turns almost entirely on whether his or her manager was or was not in compliance with Starbucks' corporate policies.  Thus, even if every single anecdote described in York's declarations "is true, that would not demonstrate that the entire company "operate [s] under a general policy of [denying employee's their Labor Code benefits], which is what respondents must show to certify a companywide class." Dukes, 131 S.Ct. at 2556.  As the Supreme Court noted in Dukes, the "commonality" inquiry exists to determine whether there are any common questions subject to an answer on a class-wide basis before one even gets to the question of predominance.  But it follows that if there are none, then the predominance question is rendered moot.  That is the case here with each sub-class except for the two-partner sub-class.

As to the two-partner sub-class, the Court concludes that predominance is met. The evidence on the lost meal break claim in the two partner context is simple and straightforward.  Where only two partners were operating a retail location, Starbucks' policy mandates that neither partner leave the store during breaks.  York contends that this should be construed as an on-duty meal break for which compensation must be paId.  If she is correct on the law, it should not be difficult through company records to identify the instances in which the two-partner rule was in effect and the number of meal breaks taken by an employee while working under the two-partner mandate. There are virtually no individualized questions that would need to be answered to determine whether an employee is entitled to recover assuming that York establishes the premise on which the claim is based.  Accordingly, the Court concludes that predominance is established for the two-partner sub-class.

### b. Superiority

After determining that common questions of law or fact predominate, the plaintiff must also demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3).  To determine whether there are sufficient questions common to all prospective plaintiffs, and if class action treatment would be more efficient than having a number of separate trials, the Court considers the factors set forth in Rule 23(b)(3). Amchem Prods., 521 U.S. at 616; Zinser, 253 F.3d at 1190.  Typically, a class action is superior if the case presents a large volume of individual claims that could strain judicial resources if tried separately and if each potential plaintiff's recovery may not justify the cost of individual litigation.  See Amchem Prods., 521 U.S. at 616-17; Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985); Las Vegas Sands, 244 F.3d at 1163.  As discussed below, the Court finds that the four factors designated under Rule 23(b)(3) weigh in favor of certification of the two-partner sub-class.

The first factor is "the interest of members of the class in individually controlling the prosecution and defense of separate actions." FED. R. CIV. P. 23(b)(3)(A).  "This factor is most relevant where each class member has suffered sizeable damages or has an emotional stake in the litigation." Zinser, 253 F.3d at 1190. Likewise, "[w]here damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action." Id.; Haley, 169 F.R.D. at 652.

Here, there is no evidence in the record that would indicate that any particular class member has an emotional stake in the litigation, or whether one of the partners suffered damages disproportionately high compared to the other putative class members.  Because of this, the Court finds that the first factor weighs in favor of finding that class treatment of the two-partner sub-class is superior to individual actions.

The second factor is "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class." FED. R. CIV. P. 23(b)(3)(B).  The record does not contain any information about other pending lawsuits that might need to be enjoined.  Thus, this factor also weighs in favor of class

certification.

The third factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." FED. R. CIV. P. 23(b)(3)(C).  Here, there is no reason to believe that concentrating this action in this Court is undesirable, especially considering that the challenge is under California law, and the proposed sub-class is composed of only California retail store employees.   Here the resolution of the two-partner claims can be efficiently and expeditiously resolved in this Court, which favors certification of the sub-class.

Finally, the fourth factor addresses "the difficulties likely to be encountered in the management of a class action." FED. R. CIV. P. 23(b)(3)(D).  With respect to this factor, the court looks to whether "the complexities of class action treatment outweigh the benefits of considering common issues in one trial. . . ." Zinser, 253 F.3d at 1192 (citation omitted).  Here, neither party raises any specific additional arguments addressing this element.  In the Court's view, the management of the two-partner sub-class litigation poses no particularly difficult management problem which suggests that, on balance, a class action resolution of the two-partner claim is superior to individualized litigation, and thus, Rule 23(b)(3) has been adequately established in the case at hand.

### 3. CLASS COUNSEL

Once a class is certified, the Court must appoint class counsel. FED. R. CIV. P. 23(g)(1)(A).  Class counsel "must fairly and adequately represent the interests of the class." FED. R. CIV. P. 23(g)(1)(B).  In appointing class counsel, the court must consider: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class. FED. R. CIV. P. 23(g)(1)(C)(i).  The Court may consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." FED. R.

CIV. P. 23(g)(1)(C)(ii).

Here, Plaintiff's counsel, Initiative, has presented sufficient evidence that it is qualified to represent the class members in this action. Counsel has demonstrated that it has investigated potential claims in the action by conducting extensive discovery in this matter, as evidenced by the exhibits and other documents provided with this motion. Counsel also has extensive experience with class actions, has successfully litigated numerous wage and hour class actions in both trial and appellate courts, and has the resources and staff to diligently manage the action. (Primo Decl. ¶¶ 1-2.)

Thus, Plaintiff's counsel has demonstrated that it will "fairly and adequately represent the interests" of the two partner subclass. As such, the Court **APPOINTS** Initiative as the class counsel.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **CERTIFIES** the two partner subclass pursuant to Rule 23, and **APPOINTS** Initiative as the class counsel and York as the class representative. The Court **DENIES** the motion for class certification as to the remaining 12 proposed sub-classes.

**IT IS SO ORDERED.**

DATED: November 23, 2011

_____
Judge Gary Allen Feess
United States District Court