**LINKS: 224, 229, 230**

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SUMMER YORK, an individual, and on behalf of other members of the general public similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>STARBUCKS CORPORATION, a Washington corporation, and STARBUCKS COFFEE COMPANY, a Washington corporation,<br><br>Defendants. | **Case No. CV 08-07919 GAF (PJWx)**<br><br>MEMORANDUM & ORDER REGARDING MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, AWARD OF ATTORNEYS' FEES, AND MOTION TO STRIKE |

**I.**

**INTRODUCTION**

After more than four years of litigation, Plaintiffs Summer York and KaTina Burns ("Plaintiffs") have negotiated a settlement of their wage and hour class action claims against Defendant Starbucks Corporation d/b/a Starbucks Coffee Company ("Defendant"). The thrust of Plaintiffs' allegations is that Defendant denied employees statutorily-mandated meal breaks and issued wage statements that did not list the applicable overtime rate, in violation of the California Labor Code. (See Docket No.

244 [Second Amended Class Action Complaint ("SAC")].) Plaintiffs now move this Court to grant final approval of the proposed class action settlement agreement (the "Proposed Settlement"). (Docket No. 229, [Motion for Final Approval of Class Action Settlement ("Mem.")] at 1.) They also filed a motion for attorneys' fees and expenses. (Docket No. 224 [Motion for Attorneys' Fees and Expenses ("Fees Mem.")].) And Defendant filed a motion to strike the declaration of Theodore Eisenberg, which was included in connection with the motion for attorneys' fees. (Docket No. 230 [Motion to Strike ("Strike Mem.")].) Pursuant to a Joint Stipulation, the motion to strike was withdrawn and the amount Plaintiffs requested in attorneys' fees and expenses was reduced. (Docket No. 235 [Joint Stip.].)

Because the Court concludes that the Proposed Settlement meets the requirements of Federal Rule of Civil Procedure 23, the motion for final approval is **GRANTED**, the Settlement Classes are **CERTIFIED**, and the Proposed Settlement is **APPROVED**. As discussed further below, Plaintiffs' motion for attorneys' fees and expenses is **GRANTED** as modified in the Parties' Joint Stipulation, and Defendants' motion to strike is **DISMISSED**.

## II.

## BACKGROUND

The Proposed Settlement is the "culmination of years of arduous litigation of novel and developing issues that often required extensive original legal research and briefing." (Mem. at 2–3.) Although "[t]he considerable breadth and scope of this litigation make it practically impossible to render an exhaustive summary of all the motion practice within reasonable page limitations," Plaintiffs urge that, during the course of the litigation, "the Parties and the Court thoroughly explored the claims and Defendant's affirmative defenses, which is particularly noteworthy given the evolution of the relevant substantive and procedural law." (Id. at 3.)

The parties were able to reach a settlement in this action following two lengthy mediations. The first mediation occurred before Edward A. Panelli on November 17,

2010, and "[a]lthough the Parties were unable to reach a settlement at this mediation, it provided an important basis for continuing negotiations." (Id. at 3–4) (citing Docket No. 229-1 [Decl. of Matthew T. Theriault ("Theriault Decl.")] ¶ 52.) Subsequently, "[o]n October 30, 2012, the Parties engaged in a second mediation with David A. Rotman, a respected mediator of wage-and-hour class actions who was particularly helpful in managing the expectations of the Parties and providing a useful, neutral analysis of the issues and risks to both sides." (Id. at 4) (citing Theriault Decl. ¶ 52.) During this second mediation, "the Parties made significant progress towards settlement, agreeing on material terms in November 2012, and, ultimately finaliz[ed] and execut[ed] the Settlement Agreement in May 2013." (Id.) Plaintiffs assert that "[a]t all times, the Parties' negotiations were adversarial and non-collusive," and the Proposed Settlement thus "constitutes a fair, adequate, and reasonable compromise of the claims at issue." (Id.)

The Proposed Settlement encompasses two specific subclasses, "the Meal Break Settlement Subclass and the Wage Statement Settlement Subclass." (Id.) The Meal Break Settlement Subclass is comprised "of all persons employed by Starbucks within the state of California in the job categories of café attendant, barista, and shift supervisor during the period from December 2, 2004[,] to January 31, 2013." (Id.) (citing Docket No. 218-1, Ex. A [Settlement Agreement] ¶ 1.11.) The second subclass—the Wage Statement Settlement Subclass—"consists of all persons employed by Starbucks in the state of California in the job categories of café attendant, barista, shift supervisor, assistant store manager, and store manager during the period from December 2, 2007[,] to January 31, 2013." (Id.) (citing Settlement Agreement ¶ 1.12.) Accordingly, "[t]he release of claims that Starbucks will receive is very narrow," and will be limited to "meal period claims resulting from the Two-Partner Rule and wage statement violations," as follows:

(1) "any claims that were or could be asserted relating to Starbucks' failure to provide compliant wage statements to employees with all

3

applicable hourly rates during the period from December 2, 2007 to the date on which the Court enters an order granting final approval of the Settlement"; and

(2) "any claims that were or could have been asserted relating to Starbucks' failure to provide statutory meal breaks in the two-partner circumstance during the period from December 2, 2004 to the date on which the Court enters an order granting final approval of the Settlement."

(Mem. at 6.) In addition, "[u]pon Final Approval, the Settlement Class Members and all Class Members who did not submit a timely opt out will be deemed to have fully settled the Released Claims." (Id.)

Plaintiffs and Defendants have agreed to settle the claims of these subclasses for the Gross Settlement Amount of $3 million. (Id. at 5.) This figure "includes: (1) settlement payments to participating Class Members; (2) a $75,000 payment to the California Labor & Workforce Development Agency ("LWDA"); (3) claims administration costs currently estimated at $280,000; and (4) incentive awards to Summer York in the amount of $10,000 and KaTina Burns in the amount of $2,000." (Id.) "Subject to the Court's approval of payment to the LWDA, the costs of settlement administration, and Named Plaintiff Enhancements, the Net Settlement Amount will be available for distribution to Class Members." (Id.) This leaves an estimated Net Settlement Amount of $2,633,000. And "[e]ach Class Member's share of the Net Settlement Amount will be proportional to the number of weeks each Class Member worked during the Meal Break Claims Period and/or the Wage Statement Claims Period." (Id.) (citing Settlement Agreement ¶ 10.2.) In the event that Class Members claim less than one hundred percent of the Net Settlement Amount, "the Claims Administrator will proportionately increase each participating Class Member's settlement payment to ensure that 100% of the Net Settlement Amount is disbursed." (Id. at 7.)

4

Each potential Class Member has already received a Notice of Class Action Settlement and Claim Form, pursuant to this Court's June Order. (Mem. at 7.) The Class Notice, which was approved by the Court, "provided Class Members with an estimate of how much they would be paid if the Settlement received final approval." (Id.) The Claim Forms and Notice were mailed to Class Members' last known addresses, which were further "updated using the National Change of Address Database maintained by the U.S. Postal Service." (Id.) Class Members were given 60 days within which to respond by submitting Claim Forms, objecting to the Proposed Settlement, or opting out. (Id. at 1.) Of the more than 161,000 potential Class Members, 24 opted out, and only 1 objected, while 10,620 Class Members have properly submitted Claim Forms. (Id. at 7.)

Finally, in addition to the $3 million Gross Settlement Amount, Starbucks also "agrees to non-monetary relief." (Id. at 5.) It "will change the format of wage statements issued in California to specify applicable numeric overtime hourly rates." (Id.) (citing Settlement Agreement ¶ 17.9.) It "will amend its California rest period policy to specifically refer to a period of four hours or a major fraction thereof." (Id.) (citing Settlement Agreement ¶ 17.9.) And it "intends to utilize on-duty meal waivers in any situations covered by its 'two-partner rule' in California stores or implement other changes to eliminate potential violations." (Id. at 5–6) (citing Settlement Agreement ¶ 17.9.)

## III.
## DISCUSSION

### A. MOTION FOR FINAL APPROVAL OF SETTLEMENT

#### 1. LEGAL STANDARD

Under FRCP Rule 23(e), "claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). A court must engage in a two-step process to approve a proposed class action settlement. First, the court must determine whether the proposed settlement

5

deserves preliminary approval. Nat'l Rural Telecomms. Coop. v. DirecTV, Inc., 221 F.R.D. 523, 525 (C.D. Cal. 2004). Second, after notice is given to class members, the Court must determine whether final approval is warranted. Id. A court should approve a settlement pursuant to Rule 23(e) only if the settlement "is fundamentally fair, adequate and reasonable." Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1375 (9th Cir. 1993) (internal quotation marks omitted); accord In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 458 (9th Cir. 2000) (citing Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998)).

Circuit law teaches that the court must balance the following factors to determine whether a class action settlement is fair, adequate, and reasonable:

(1) the strength of the plaintiff's case;

(2) the risk, expense, complexity, and likely duration of further litigation;

(3) the risk of maintaining class action status throughout the trial;

(4) the amount offered in settlement;

(5) the extent of discovery completed and the stage of the proceedings;

(6) the experience and views of counsel;

(7) the presence of a governmental participant; and

(8) the reaction of the class members to the proposed settlement.

Torrisi, 8 F.3d at 1375; accord Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1242 (9th Cir. 1998); Hanlon, 150 F.3d at 1026. "In addition, the settlement may not be the product of collusion among the negotiating parties." In re Mego Fin. Corp. Sec. Litig., 213 F.3d at 458. These factors are not exclusive, and one factor may deserve more weight than the others depending on the circumstances. Torrisi, 8 F.3d at 1376. In some instances, "one factor alone may prove determinative in finding sufficient grounds for court approval." Nat'l Rural Telecomms. Coop., 221 F.R.D. at 525–26 (citing Torrisi, 8 F.3d at 1376). In addition, "[t]he involvement of experienced class action counsel and the fact that the settlement agreement was reached in arm's length negotiations, after relevant discovery had taken place create a presumption that the

6

agreement is fair." Linney v. Cellular Alaska P'ship, Nos. C-96-3008 DLJ, C-97-0203 DLJ, C-97-0425 DLJ, C-97-0457 DLJ, 1997 WL 450064, *5 (N.D. Cal. July 18, 1997), aff'd, 151 F.3d at 1234.

## 2. APPLICATION OF TORRISI FACTORS

### a. Strength of Plaintiffs' Case

Plaintiffs urge that "the proposed relief is likely superior to the relief that the Class might have obtained if Plaintiffs had continued to litigate the action." (Mem. at 2.) "[Al]though Plaintiffs' counsel established liability for Starbucks' noncompliant wage statements, the extent of Starbucks' exposure remained uncertain." (Id. at 10.)

Plaintiffs emphasize that the Court previously denied their "motion to obtain maximum PAGA penalties for the noncompliant wage statement claim." (Id. at 11.) (citing Docket No. 207, [11/1/12 Order] at 11.) Additionally, this Court has noted its reluctance to penalize "no injury" violations: "[t]he notion that employers who have done nothing to harm their employees are at risk because an employee might need to utilize elementary school arithmetic to determine, say, a rate of pay seems over the top." (Id.) (citing 11/1/12 Order at 7.) Given this, Plaintiffs concede that the Court may decrease the amount Plaintiffs seek in penalties against Defendants, "irrespective of the number of violations that might be proven by Plaintiffs." (Id.) Plaintiffs "determined that the settlement amount appropriately discounts the high risk of an award reduction by the Court." (Id.)

Although Starbucks has so far not contested Plaintiff Burns's typicality, Defendants would likely have disputed both this and her ability to serve as a class representative in the event of further litigation. (Id. at 12.) Plaintiffs offer that "the risk of continuing litigation, including the risk of new case law jeopardizing the PAGA award, increased costs, and expiration of a substantial amount of time, weigh heavily in favor of settlement." (Id.; see Rodriguez v. West Publ'g Corp., 563 F.3d 948, 966 (9th Cir. 2009).) Plaintiff thus professes that further prosecution of this case would undoubtedly be time-consuming, complex, and expensive, both in attorneys' fees and

costs and the presentation of expert testimony, with no guarantee of a successful outcome.

The Court therefore agrees with Plaintiffs that "[b]ased upon the record, applicable law and practical reality, it is clear that there were serious risks in overcoming potential defenses and in establishing both liability and damages." (Mem. at 10.) The negotiated resolution of this case avoids this uncertainty and therefore weighs in favor of granting final approval of the Proposed Settlement.

### *b. The Risk, Expense, Complexity, and Likely Duration of Further Litigation*

The Court has touched on this factor in discussing the strength of Plaintiff's case above. The Court's assessment of the "risk, expense, complexity, and likely duration" prong of the Torrisi analysis must be balanced against the anticipated expense of litigation. Nat'l Rural Telecomms. Coop., 221 F.R.D. at 526. "In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." Id. (quoting 4 A. Conte & H. Newberg, Newberg on Class Actions, § 11:50 at 155 (4th ed. 2002)).

This action has been litigated for over four years by competent counsel on both sides. Without a settlement, the case would likely last far longer, and entail significant risk and expense. It may require further class certification briefing, (Mem. at 11–12), and there is always the possibility that appeals could be taken from a non-negotiated judgment. A substantial amount of time and effort has already been put into this case; as Plaintiffs make clear, "[t]he Settlement is the culmination of years of arduous litigation of novel and developing issues that often required extensive original legal research and briefing." (Id. at 2–3.)

The Settlement Agreement, in addition to minimizing delay, guarantees a recovery to Class Members. Thus, the risks and potential expenses of further litigation weigh in favor of final approval, consistent with the policy preferring settlement over further time-consuming litigation. Nat'l Rural, 221 F.R.D. at 525–26.

8

### *c. The Risk of Maintaining Class Action Status Throughout Trial*

The two classes in this case—the Meal Break Class and the Wage Statement Class—have been preliminarily certified for settlement purposes. (Docket No. 223, [6/10/13 Order] at 8.) As discussed above, Starbucks has not contested the typicality of Plaintiff Burns at this stage. (Mem. at 11–12.) However, Plaintiffs maintain "that the Order Decertifying the Two-Partner Rule Meal Break Subclass posed substantial, though not insurmountable, challenges for Plaintiffs," and if the case continues "Starbucks would have vigorously opposed [Burns's] addition as a class representative and re-certification of those claims." (Id.) Plaintiffs conclude that, "with no assurance that the class would be re-certified or that liability could be established as to Plaintiffs' meal period claim, the Parties negotiated a settlement amount that correctly reflects the Parties' current procedural posture." (Id. at 12.) While the Court takes no position as to Plaintiffs' likely success in maintaining Class status through trial, settlement avoids all possible risk. This factor therefore weighs in favor of final approval of the settlement.

### *d. The Amount Offered in Settlement*

A "settlement should stand or fall on the adequacy of its terms." In re Corrugated Container Antitrust Litig., 643 F.2d 195, 211 (5th Cir. 1981). The Court examines "the complete package taken as a whole, rather than the individual component parts," to determine whether the proposal is fair. Officers for Justice v. Civil Svc. Comm'n, 688 F.2d 615, 628 (9th Cir. 1982).

Under the terms of the Settlement Agreement, Defendants have agreed to pay $3 million, as well as non-monetary relief. (Mem. at 5.) "The Gross Settlement Amount includes: (1) settlement payments to participating Class Members; (2) a $75,000 payment to the California LWDA; (3) claims administration costs currently estimated at $280,000; and (4) incentive awards to Summer York in the amount of $10,000 and KaTina Burns in the amount of $2,000." (Id.)

The Court concludes that, on the whole, the terms of the Settlement are fair and weigh in favor of granting final approval. In particular, the Court recognizes that "the

9

proposed relief is likely superior to the relief that the Class might have obtained if plaintiffs had continued to litigate the action." (Mem. at 2.)

### e. The Extent of Discovery Completed and the Stage of the Proceedings

The amount of discovery completed affects approval of a stipulated settlement because it indicates whether the parties have had an "adequate opportunity to assess the pros and cons of settlement and further litigation." In re Cylink Sec. Litig., 274 F. Supp. 2d 1109, 1112 (N.D. Cal. 2003). Nevertheless, "In the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement." Linney, 151 F.3d at 1239 (quoting In re Chicken Antitrust Litig., 669 F.2d 228, 241 (5th Cir. 1982)).

Here, the discovery conducted over more than four years of litigation indicates that the parties have sufficient information to make an informed decision regarding settlement. The Parties "thoroughly engaged in the discovery process and made use of documents and data provided by Starbucks throughout the litigation to assess its potential exposure as to Plaintiffs' claims." (Mem. at 7; see Theriault Decl. ¶¶ 43–51.) The Parties conducted 44 depositions and Plaintiffs analyzed over 12,000 pages of documents produced by Starbucks. (Theriault Decl. ¶¶ 46, 51.) Further, "Plaintiffs' counsel marshalled this discovery in multiple rounds of briefing on class certification and summary judgment. (Mem. at 7.)

The Court is therefore persuaded that the parties had sufficient information to make an informed decision about settlement and this factor weighs in favor of final approval.

### f. The Experience and Views of Counsel

"'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." Nat'l Rural, 221 F.R.D. at 528 (quoting In re Painewebber Ltd. P'ships Litig., 171 F.R.D. 104, 125 (S.D.N.Y.

10

1997)). Furthermore, a presumption of fairness applies when settlements are negotiated at arm's length, because of the decreased chance of collusion between the negotiating parties. In re First Capital Holdings Corp. Fin. Prods. Secs. Litig., MDL Docket No. 901 (JGD), 1992 U.S. Dist. LEXIS 14337, at *5–6 (C.D. Cal. June 10, 1992).

"The Parties were represented by experienced class action counsel throughout the negotiations resulting in this Settlement. Plaintiffs are represented by . . . [t]he attorneys at Capstone Law APC, [who] regularly litigate wage-and-hour claims through certification and on the merits, and have considerable experience settling wage and hour class actions. (Mem. at 14; see Theriault Decl. ¶¶ 65–66.)." In addition, arm's length settlement negotiations were "conducted before Mr. Rotman, a seasoned mediator." (Id. at 13.) The Court is therefore confident that the settlement was the product of rational compromise on the part of all involved, and that the negotiations were in no way collusive. Accordingly, this factor also weighs in favor of granting final approval.

### *g. The Presence of a Governmental Participant*

As noted in this Court's June 2013 Order, this factor is not at issue because there was no governmental participation in this case. (6/10/13 Order at 12.) Accordingly, this factor does not impact the Court's analysis.

### *h. The Reaction of Notified Class Members to the Proposed Settlement*

#### **i. Notice Procedures**

Pursuant to "the Court's Order preliminarily approving the Settlement agreement, the Parties engaged KCC to provide settlement administration services. (Mem. at 5–6; see Docket No. 229-4 [Cudworth Decl.] ¶ 2.) "The mailing addresses contained in the Class List were processed and updated using the National Change of Address Database maintained by the U.S. Postal Service. On July 10, 2013, KCC mailed Class Notices to all Class Members via First-Class U.S. mail." (Id. at 7; see Cudworth Decl. ¶ 4.) Twenty-four Class Members opted out of the Settlement and one Class Member objected, though there are 10,620 Class Members in total. (Id. at 7–8.)

11

### ii. Conclusion Regarding Class Reaction

Given the low number of Class Members who have opted out or objected, the Court concludes that the reaction of the Class weighs in favor of granting final approval. "It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of [the] proposed class settlement . . . are favorable to the class members." Nat'l Rural, 221 F.R.D. at 529.

### 3. CONCLUSION RE: TORRISI FACTORS

Defendants do "not oppose the final approval of the Class Action Settlement Agreement and Stipulation." (Docket No. 232, [Statement of Non-Opp.].)  Based on the above analysis, the Court concludes that, on balance, the Torrisi factors weigh in favor of granting final approval of the Settlement Agreement, because it is fundamentally fair, adequate, and reasonable.

### 4. FINAL CERTIFICATION

In accordance with its 6/10/13 Order, the Court confirms its prior finding that the Settlement Class complies with the requirements of Rules 23(a) and 23(b)(3), and should therefore be certified for the purposes of settlement.  (See 6/10/13 Order at 8.)

### 5. FINAL APPROVAL OF PLAN OF ALLOCATION

The Plan of Allocation, like the class settlement as a whole, must be fair, reasonable, and adequate. Omnivision, 559 F. Supp. 2d at 1045 (N.D. Cal. 2008); see also Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1284–85 (9th Cir. 1992).  It is reasonable to allocate settlement funds to class members based on the extent of their injuries. Omnivision, 559 F. Supp. 2d at 1045.  The Court finds that the proposed Plan of Allocation is reasonable.

As outlined in detail in the "Background" section of this Order, the $3 million (less the described costs) will be a direct monetary distribution to the Class Members, proportional to the number of weeks each Class Member worked during the Claims Periods.  (See supra at 4.)  In addition, Claim Forms and Notices to the settlement classes were provided "on July 10, 2013, . . . via First-Class U.S. Mail." (Cudworth Decl. ¶ 4.)

The mailing addresses were determined based on last known addresses, which were then "updated using the National Change of Address Database maintained by the U.S. Postal Service." (Mem. at 7.) These procedures comport with due process. The Court accordingly finds the Plan fair and reasonable.

### 6. CONCLUSION RE: MOTION FOR FINAL APPROVAL

For the foregoing reasons, Plaintiffs' motion for final approval of the Settlement Agreement and Class Certification is **GRANTED**.

### B. MOTION FOR ATTORNEYS' FEES AND MOTION TO STRIKE

Plaintiffs have also filed a separate motion for attorneys' fees. (Fees Mem.) They initially sought $4,220,501 in fees, as well as $246,511 in unreimbursed costs. (Fees Mem. at 25.) Defendant initially opposed the motion, and responded with a motion to strike one of the declarations filed in support of that motion. (Strike Mem.) However, the parties have since filed a joint stipulation requesting that all papers filed in connection with both motions, other than the motion for attorneys' fees itself, be withdrawn. (Docket No. 235, [Joint Stip.] at 3.) The motion to strike is therefore **DISMISSED**. As a result of the Joint Stipulation, Defendants are also no longer opposing Plaintiffs' motion for attorneys' fees. Instead, the Parties have agreed that Plaintiffs' request for attorneys' fees and costs shall be reduced to a combined total of $1,900,000. (Joint Stip. at 2.)

The Joint Stipulation specifies that the requested attorneys' fees and costs "will not be distributed from a common fund," and therefore "the amount of fees and expenses awarded to Plaintiffs' Counsel will have no impact on the Class Members' payments." (Fees Mem. at 3.) The Court is persuaded that this is true. The Parties reached the Proposed Settlement separately from—and indeed, several months prior to—reaching an agreement as to attorneys' fees.[1] Moreover, the total award of $1,900,000 is within the

---

[1] The Court is mindful of the fact that, even if "the defendant in form agrees to pay the fees independently of any monetary award or injunctive relief provided to the class in the agreement" there is still a need for the Court to "carefully to scrutinize the fee award." Jones v. GN Netcom, Inc. (In re Bluetooth Headset Prods. Liab. Litig.), 654 F.3d 935, 948 (9th Cir. 2011) (quoting Staton v. Boeing Co., 327 F.3d 938, 964 (9th Cir. 2003)). Because the $3 million award for Class Members was agreed upon

13

range of Plaintiffs' attorneys' reasonable lodestar amount, plus costs. (Fees Mem. at 3, 24–25.) In fact, it is an almost 60% reduction from the lodestar amount Plaintiffs initially sought.

The Court concludes that the amount requested for attorneys' fees and expenses is reasonable and that no special circumstances exist warranting alteration of the award. The Court therefore **GRANTS** Plaintiffs' motion for attorneys' fees and expenses in the amount of $1,900,000.

### III.
### CONCLUSION

Based on the foregoing, Plaintiffs' motion for final approval of the Proposed Settlement is **GRANTED**. The motion for attorneys' fees and expenses is likewise **GRANTED in the amount of $1,900,000.** The motion to strike is **DISMISSED**.

**IT IS SO ORDERED.**

DATED: October 29, 2013

_____
Gary Allen Feess
United States District Judge

---

long before the Parties agreed to attorneys' fees, however, the Court is persuaded that the Joint Stipulation does not betoken collusion to the detriment of the Class Members' payments.